[No. A024880. Sixth Dist. Aug. 23, 1985.]

COUNTY OF SANTA CRUZ, Plaintiff and Respondent, v.
CITY OF WATSONVILLE et al., Defendants and Appellants.

834

**COUNSEL**

Donald R. Haile, City Attorney, for Defendants and Appellants.

Weiser, Kane, Ballmer & Berkman, Herbert M. Weiser, Goldfarb & Lipman, Lee C. Rosenthal, McDonough, Holland & Allen, T. Brent Hawkins, Joseph E. Coomes, Jr., Straddling, Yocca, Carlson & Rauth and Thomas P. Clark as Amici Curiae on behalf of Defendants and Appellants.

Dwight L. Herr, County Counsel, for Plaintiff and Respondent.

OPINION

AGLIANO, J.—

## Introduction

The instant action involves interpretation of the scope of the Westside Industrial Redevelopment Plan which was drafted and implemented by defendants City of Watsonville (City) and the Redevelopment Agency of the City of Watsonville (Agency) in 1973.[1] Nine years after the Plan was adopted, plaintiff County of Santa Cruz (County) filed a complaint seeking, inter alia, a declaration that the redevelopment plan is limited to a single project for the construction of a fire access road known as the Ford Street Extension Project. The City and the Agency object, claiming the plan typically authorizes broadscale redevelopment within a 257.6 acre area including the Ford Street Extension Project. Following a two-day trial, the trial court agreed with the County and enjoined defendants from proceeding further with redevelopment other than with the fire access road; ordered defendants to comply with certain accounting procedures; ordered defendants to return to the County auditor-controller tax increment funds used by defendants to finance redevelopment after the complaint was filed; and ordered termination of the Plan following completion of the fire access road with any surplus tax increment funds to be returned to the County auditor-controller. Defendants appeal.

Plaintiff filed a cross-appeal from a portion of the judgment which barred plaintiff's challenge to defendants' claims for certain tax increment funds; denied relief as to the tax increment funds used by defendants on street projects prior to the filing of the complaint; denied an accounting of interest income realized from the investment of tax increment funds; and allowed the use of tax increment funds to construct the fire access road as an improved street with curbs, gutters, and sidewalks.

## Statement of Facts

The City of Watsonville established an area of approximately 257.6 acres mostly within the City's boundaries to be redeveloped and a plan to imple-

---

[1]The Cabrillo Community College District, Pajaro Valley Unified School District, and Santa Cruz County Flood Control and Water Conservation District were named as defendants in their capacity as affected taxing agencies. However, they have not joined in any appeal from the judgment.

ment such redevelopment was drafted. Since the plan also included the redevelopment of an area within County jurisdiction, the Community Redevelopment Law (CRL)[2] required the City and the Agency to obtain the approval and consent of the Santa Cruz County Board of Supervisors for the plan and its implementation. On February 27, 1973, the city council adopted a resolution requesting that the County board of supervisors authorize by ordinance the redevelopment of an area within the County's jurisdiction. In seeking this authorization, City officials presented the County with information indicating an intent to construct a road on County land for fire protection purposes and that the amount of tax increment revenues necessary for this work was $350,000. By ordinance enacted on March 6, 1973, the board of supervisors granted extraterritorial jurisdiction to the City. On July 3, 1973, the board of supervisors adopted an ordinance approving the Westside Industrial Redevelopment Plan in its entirety. A week later, the city council voted final adoption of the ordinance approving the plan and authorizing its implementation by the Agency.

The Westside Industrial Redevelopment Plan serves as the charter for the Agency and is to be in effect for 25 years from the date of its adoption. It includes elements mandated by the CRL, and various maps relating to land use and boundaries. The stated objectives of the plan are as follows: "[T]o arrest the decline and decay throughout the Project Area through restoration of the industrial areas, to improve traffic circulation and to reduce the hazard and risk to the City from sweeping fires. Further objectives are to make the area a source of pride to the persons residing and working in Watsonville or visiting the City, guide development towards an urban environment preserving the industrial viability of the City and stimulate and attract private investment, thereby improving the City's economic health, employment opportunities and the tax base. The foregoing objectives shall be accomplished through removal of structurally substandard buildings, elimination of blighting influences, provision of land for needed public facilities, construction of roads and streets, removal of impediments to land disposition and development and achievement of changes in land use."

The plan also states the methods by which redevelopment will be accomplished. "[A]lteration, modernization, general improvement or any combination thereof (hereinafter called 'rehabilitation') by the owners of certain existing structures; acquisition of real property by purchase, gift, devise, exchange, condemnation or other lawful means; relocation of the occupants presently residing in structures which are acquired; demolition, removal or

---

[2]The CRL is set forth in the Health and Safety Code sections 33000 et seq. All statutory references are to the Health and Safety Code, unless otherwise noted.

clearance of certain existing buildings and structures on land acquired by the Agency; arrangement with proper authorities for the vacation and realignment of certain streets, utilities, and other rights of way, and other public purposes; installation of pedestrianways, and bicycle parking areas and stands, and other necessary site improvements, facilities, and underground placement of utility lines and services; formulation of rules for owner participation; formulation of rules governing reasonable preference to persons who are engaged on [sic] business in the project area to re-enter in business within the redeveloped area; sale or lease of all land acquired by the Agency for reuse in accordance with the Plan and such additional conditions as may be imposed by the Agency in any manner authorized by law in order to carry out the purposes of redevelopment."

The plan makes a single reference to the Ford Street Extension Project. "The Plan indicates that Ford Street will be developed as a secondary thoroughfare from Walker Street westerly along the edge of the presently developed lands connecting with West Beach Street." The plan does not identify any other specific project.

The plan also sets forth the available financing methods. Included is a provision authorizing tax increment revenues as a source of funding for redevelopment. (§ 33670.) Tax increment financing is a device by which the expected increase in property taxes from a redevelopment project is used to finance the project itself. The real property within the redevelopment area is assessed in the year that the redevelopment plan is adopted. The taxing agencies then retain the tax revenues attributable to the original assessed value and the portion which exceeds the original assessment is available for use by the redevelopment agency. (§ 33670.) If the revenues are not used for redevelopment, they are distributed to various taxing agencies. In the present case, the distribution would be as follows: County of Santa Cruz—23 percent; City of Watsonville—23 percent; School districts, Cabrillo Community College District and other districts—54 percent.

Following the approval of the plan, the Agency spent over $1 million of tax increment revenues on projects for the construction and reconstruction of City streets within the area covered by the plan. However, the fire access road was not yet constructed.

For the period from 1974-1975 through 1977-1978, the City did not credit any interest income to the Agency as to tax increment funds on deposit. During the years 1979-1980 and 1980-1981, the City did not allocate the same percentage of interest income to the Agency as it allocated to City funds.

*Discussion*

A. *Scope of the Plan*

██ The City and Agency contend the plan provides a method of action to eradicate blight within the entire redevelopment area and thus is not limited to the construction of a single street as a matter of law. We agree.

The Legislature has declared that blight constituting social or economic liabilities exists in many communities in California and this condition requires the redevelopment of certain areas in the interest of the health, safety and general welfare of the people living and working in these communities. (§ 33030.) Some of the characteristics of a blighted area are the "economic dislocation, deterioration, or disuse [of the area], resulting from faulty planning" and "the existence of inadequate streets." (§ 33032.) ██ A finding of blight must be made in order for a redevelopment agency to exercise jurisdiction. (*Redevelopment Agency* v. *Hayes* (1954) 122 Cal.App.2d 777 [266 P.2d 105].) ██ We note that in the instant case the County does not raise the issue of whether the City's determination of blight within the area was properly made.

Redevelopment is statutorily defined in broad terms as "the planning, development, replanning, redesign, clearance, reconstruction, or rehabilitation, or any combination of these, of all or part of a survey area, and the provision of such residential, commercial, industrial, public, or other structures or spaces as may be appropriate or necessary in the interest of the general welfare, including recreational and other facilities incidental or appurtenant to them." (§ 33020.) Redevelopment includes, in part, "[t]he replanning or redesign or original development of undeveloped areas" which "are stagnant or improperly utilized because of defective or inadequate street layout, faulty lot layout in relation to size, shape, accessibility, or usefulness, . . . ". (§ 33021, subd. (c)(1).)

It is the stated policy of the Legislature to promote the redevelopment of blighted areas by providing all appropriate means, including eminent domain and the authority to expend public funds, whenever redevelopment cannot be accomplished by private enterprise alone. (§ 33037.) A redevelopment agency exists in each community (city and county) in the state, however the agency has the power to exercise governmental functions only after the legislative body of a community declares the need for the agency. (§§ 33100-33101.)

A redevelopment plan which an agency proposes must contain certain statutorily defined elements. They include: a legal description of the project

area (§ 33332); the open space and street layout; limitations on the type, size, height, number, and proposed use of all buildings; the number of dwelling units; the property specified for public purposes (§ 33333); the proposed method of financing redevelopment (§ 33334); agency authority to sell or lease property (§ 33335); adequate safeguards that redevelopment will be carried out pursuant to the plan (§ 33336, subd. (a)); provisions for controls and restrictions or covenants running with the land sold or leased for private use (§ 33336, subd. (b)); nondiscrimination clauses (§ 33337); covenants, conditions and restrictions prescribed by the legislative body (§ 33338); and provision for participation by property owners or alternative plans for redevelopment if owners fail to participate (§§ 33339, 33340, 33345).

To implement a redevelopment plan, the procedures are as follows: the legislative body establishes a survey area (§§ 33310-33312); the planning commission selects a project area comprised of all or part of the survey area and formulates a preliminary plan (§§ 33322-33324); after the preliminary plan is submitted to the redevelopment agency, the agency notifies tax officials of its intent to adopt a redevelopment plan (§ 33327). Prior to the public hearings which must be held by the agency and the legislative body (§§ 33348, 33355), three documents are prepared: the redevelopment plan, the report to the legislative body (§ 33352) and an environmental impact report (§ 33352 and Pub. Resources Code, § 21151). The legislative body then adopts the redevelopment plan by ordinance with the specific findings required by section 33367.[3]

---

[3]Section 33367 provided the following: "The ordinance shall contain: [¶] (a) The purposes and intent of the legislative body with respect to the project area. [¶] (b) The plan incorporated by reference. [¶] (c) A designation of the approved plan as the official redevelopment plan of the project area. [¶] (d) The findings and determinations of the legislative body that: [¶] (1) The project area is a blighted area, the redevelopment of which is necessary to effectuate the public purposes declared in this part. [¶] (2) The redevelopment plan would redevelop the area in conformity with this part and in the interests of the public peace, health, safety, and welfare. [¶] (3) The adoption and carrying out of the redevelopment plan is economically sound and feasible. [¶] (4) The redevelopment plan conforms to the general plan of the community. [¶] (5) The carrying out of the redevelopment plan would promote the public peace, health, safety, and welfare of the community and would effectuate the purposes and policy of this part. [¶] (6) The condemnation of real property, if provided for in the redevelopment plan, is necessary to the execution of the redevelopment plan and adequate provisions have been made for payment for property to be acquired as provided by law. [¶] (7) The agency has a feasible method or plan for the relocation of families and persons displaced from the project area, if the redevelopment plan may result in the temporary or permanent displacement of any occupants of housing facilities in the project area. [¶] (8) There are or are being provided in the project area or in other areas not generally less desirable in regard to public utilities and public and commercial facilities and at rents or prices within the financial means of the families and persons displaced from the project area, decent, safe, and sanitary dwellings equal in number to the number of and available to such displaced families and persons and reasonably accessible to their places of employment. [¶] (e) A statement that the legislative body is satisfied permanent housing facilities

By exercising certain of its powers to implement redevelopment, a redevelopment agency may induce private investment in an area. The success of any redevelopment project is dependent upon whether private lenders, developers, owners, and tenants can be persuaded to participate in the process. Thus, a redevelopment agency is unique among public entities since in order to achieve its objective of eliminating blight it must rely upon cooperation with the private sector. Redevelopment is also a process which occurs over a period of years. These realities dictate that a redevelopment plan be written in terms that enhance a redevelopment agency's ability to respond to market conditions, development opportunities and the desires and abilities of owners and tenants. Such a plan then cannot always outline in detail each project that a redevelopment agency will undertake during the life of the plan. (§§ 33132, 33133, 33339, 33339.5, 33380, 33381, 33601; *In re Redevelopment Plan for Bunker Hill* (1964) 61 Cal.2d 21 [37 Cal.Rptr. 74, 389 P.2d 539].)

A redevelopment plan which is general in nature has been approved by our Supreme Court. ■ "It appears that a final plan under the Community Redevelopment Law does not require an architectural plan complete with engineers' specifications; it contemplates, rather, a comprehensive method or scheme of action; a way proposed to carry out within the essential framework of the law a particular project of redevelopment . . . . [¶] The Legislature can be assumed to have recognized that a final plan must be enacted before the agency can commence acquisition of land and that thereafter the land must be resold to redevelopers for actual construction so that some appreciable interval of time must elapse between the evolution and formulation of the final plan by the agency, its adoption by the legislative body and its ultimate fulfillment by redevelopers. Obviously, some flexibility in the final plan so far as it relates to section 33707 is essential to avoid the necessity of constantly seeking amendment by the legislative body . . . each time that some unforeseeable exigency arises. . . . [¶] It cannot be seriously argued that a final plan must be a compilation of blueprints or working drawings, representing final engineering studies, primarily because the agency is not the one who does the building. The final plan is not required to be precise from an engineering standpoint but only as reasonably precise and detailed from a planning standpoint as may be expected in light of 'the complexity and diversity of the conditions which will be encountered.'" (*In re Redevelopment Plan for Bunker Hill, supra,* 61 Cal.2d 21, 52-54.)

will be available within three years from the time occupants of the project area are displaced and that pending the development of such facilities there will be available to such displaced occupants adequate temporary housing facilities at rents comparable to those in the community at the time of their displacement."

■ In the instant case, the plan contains all mandatory provisions as outlined in the CRL. The plan describes blight in the area; designates proposed and existing streets; outlines the objectives of the redevelopment process, and discusses the redevelopment techniques to be applied to structures, streets, utilities, pedestrian ways, and site improvements. The uncontroverted expert testimony established that the plan is a typical comprehensive redevelopment plan and, in the expert's opinion, the plan provides for a general exercise of power by the Agency in the area of redevelopment.

Moreover, we note that in adopting the plan, the City and Agency complied with the detailed and time-consuming procedures mandated by the CRL. The City established a survey area; the planning commission formulated a preliminary plan; tax officials were notified; public hearings were held; a final redevelopment plan and an environmental impact report were drafted; and the plan was adopted by the City.

■ The County relies almost exclusively on the transcripts of three board of supervisors' meetings introduced into evidence to prove that the plan is limited to a single street extension and that the City and the Agency are now estopped from claiming that the general language in the plan authorizes more. The transcript of the March 6, 1973 meeting contains the City's request for extraterritorial jurisdiction while the transcripts of the June 26, 1973 and July 3, 1973 meetings contain discussion regarding the County's approval of the plan.

The trial court admitted the transcripts into evidence on the following bases: "Whether the approval of the Westside Industrial Redevelopment Plan is viewed as legislative or administrative in nature, the complete certified transcripts of the hearings of the Board of Supervisors when acting on the Plan are admissible either as legislative history or as part of the administrative record. Evidence surrounding the adoption of the Plan is further admissible to resolve ambiguities in the Plan as to its intended scope, . . . [¶] The transcripts were also admissible on the issue of whether the defendants City and Agency were estopped from attempting to take a position in this litigation at variance with the representations made by the officers of the defendants when obtaining the plaintiff's consent to the Westside Industrial Redevelopment proceedings and approval of the Westside Industrial Redevelopment Plan."

It is well settled that the testimony or opinions of individual members of a legislative body are inadmissible for purposes of interpreting a statute. (*Boie-Hansen* v. *Sisters of Charity* (1957) 152 Cal.App.2d 845, 848 [314 P.2d 189].) ■ An ordinance enacted under the authority of a statute has the same effect as a statute and it should be construed as if the terms were

established by an act of the Legislature. (*Murphy* v. *City of San Luis Obispo* (1898) 119 Cal. 624, 632 [51 P. 1085].) ▮▮▮ Individual legislators may not be questioned to determine the evidence upon which they relied or their reasons for voting a particular way. (*City of Fairfield* v. *Superior Court* (1975) 14 Cal.3d 768, 772 [122 Cal.Rptr. 543, 537 P.2d 375].) In *County of Los Angeles* v. *Superior Court* (1975) 13 Cal.3d 721, 727 [119 Cal.Rptr. 631, 532 P.2d 495], the court stated that "the doctrine which precludes judicial delving into the subjective mental processes of individual legislators is a corollary of the related legal principle which establishes that the validity of a legislative act does not depend on the subjective motivation of its draftsmen but rests instead on the objective effect of the legislative terms."

Thus, in this case none of the supervisors could have testified as to his interpretation of what the ordinances in question addressed, that is, whether the ordinances authorized a redevelopment plan limited to a single project or one which envisioned several projects. Consequently, evidence of their questions and statements at the meetings are also inadmissible.

Even assuming that the transcripts were properly admitted in evidence, they do not support the trial court's interpretation of the plan.

▮▮▮ At the March 6 meeting, City officials explained to the board of supervisors that "[t]he project of the request before you is to grant to the City the power of redevelopment over a portion of County territory. . . . The purpose of the project is to build a roadway extending from Ford Street, . . . We estimate that the road project will run about $350,000." In response, the board of supervisors raised two issues: whether the City would initiate annexation proceedings once the road was built and how the construction of the road would affect surrounding agricultural land. No discussion ensued regarding redevelopment of the area within the City's jurisdiction. The City officials reasonably limited their presentation to the part of the plan most directly of concern to the board of supervisors, the land area within the County's jurisdiction and how it would be affected by redevelopment.

At the June 26 meeting, City officials appeared before the board of supervisors to obtain its approval of the plan. The presentation began by focusing on the Ford Street Extension Project as a means of providing access for fire protection purposes. However, the official then spoke about the plan in broader terms, addressing such elements as the total acreage to be redeveloped, the acreage of all streets, the number of structures, zoning, the general condition of the area, financing methods, the redevelopment techniques to be applied, and how the plan complied with the CRL. Again, no questions were raised concerning the area within the City's jurisdiction.

Instead, members of the board expressed their concern that all of the County's property was in agricultural use at the time and it would be converted to industrial use if the plan were to go into effect. As a result, the board voted to send a letter to the Agency suggesting that a portion of the County land be eliminated from the proposal.

A week later, on July 7, City officials again attended a board of supervisors' meeting. At that time, the members of the board addressed themselves solely to the issue of the conversion of County land from agricultural to industrial use. They then voted to approve the plan. Thus, what emerges from the transcripts is a discussion about the plan as it would most directly affect land within the County's jurisdiction. No one questioned the terms of the plan, stated in broad language, even though a City official had briefly described its contents and the plan in its entirety was before the board of supervisors. Given these facts, we conclude there is nothing in the transcripts reasonably suggesting that the plan was limited to a single project.

Some noncontextual evidence arguably supporting the trial court's finding is contained in the environmental impact report (EIR) and the minutes of the Agency's meetings.

The EIR dated May 10, 1973, states that the plan, "while limited to the specific purpose of reconstruction of an existing street and new construction of a street, is not a specific proposal which has been planned in a rigid, inflexible arrangement." The EIR then identifies certain environmental effects. "The project proposes conversion of approximately five acres from farm to road use. Truck traffic will be increased on Ford Street west of Walker Street and a new intersection of 'T' configuration will ultimately increase congestion on West Beach Street."

The minutes of the April 10, 1973, meeting of the Agency also refer to the Ford Street Extension Project. "The Executive Director further stated the Redevelopment Agency operates within the parameters of the plan adopted by ordinance and one of the items spelled out in the Redevelopment Plan would be financing of the project by tax increment. Not financing by tax increment would mean a reordering of priorities or perhaps just not executing the project at all. The money involved would be $300,000 to $350,000 or three to three and one-half years of gas tax accumulation. Some people feel the project will be of exclusive benefit to properties directly facing the road and there is some feeling that property owners should finance this through an assessment district; however, the roadway will improve the access and circulation in the area which is extremely important for fire fighting." The minutes of the September 10, 1974, meeting of the Agency state in part that "[t]he West Side Redevelopment Project was

formed for the specific purpose of constructing Ford Street and extending Ford Street through to either Beach Street or to Errington Road which is to be determined by a study to be undertaken." The minutes do not address the issue of the scope of the plan.

In *Bancroft-Whitney Co.* v. *McHugh* (1913) 166 Cal. 140, 142 [134 P. 1157], the court stated the standard of review for an appellate court. **(6)** "[I]n examining the sufficiency of the evidence to support a questioned finding, an appellate court must accept as true all evidence tending to establish the correctness of the finding as made, taking into account, as well, all inferences which might reasonably have been thought by the trial court to lead to the same conclusion. Every substantial conflict in the testimony, is, under the rule which has always prevailed in this court, to be resolved in favor of the finding."

■ "[I]f the word 'substantial' means anything at all, it clearly implies that such evidence must be of ponderable legal significance. Obviously the word cannot be deemed synonymous with 'any' evidence. It must be reasonable in nature, credible, and of solid value; it must actually be 'substantial' proof of the essentials which the law requires in a particular case." (*Estate of Teed* (1952) 112 Cal.App.2d 638, 644 [247 P.2d 54]; *Braewood Convalescent Hospital* v. *Workers' Comp. Appeals Bd.* (1983) 34 Cal.3d 159, 164 [193 Cal.Rptr. 157, 666 P.2d 14].)

■ The redevelopment plan is not limited by either the EIR or the minutes. In the initial stages of the plan, the only project specifically contemplated by the Agency was the Ford Street Extension Project. The extension of Ford Street may well have furnished the impetus for adoption of the broader plan but it clearly did not prescribe its parameters. It does not follow, because other projects were not also mentioned at that time, the Agency was restricted in later years to the construction of a single project. Indeed, other streets within the broad contemplation of the plan were improved and/or constructed prior to the Ford Street Extension Project. This was perfectly consistent with the flexible nature of a redevelopment plan. In light of the broad language of the plan, its duration and the need for flexibility in its implementation, these references to a specific project are insufficient evidence to support a judgment restricting the scope of the plan to the construction of a fire access road. These considerations further lead us to conclude that there is no basis for finding the City and Agency are estopped from standing on the clearly manifested scope of the plan.

■ The County also contends that the City and the Agency have improperly used redevelopment funds as merely another City street fund. The County points out that the only provision in the CRL addressing street im-

provements is section 33421. This section states that an agency, in connection with the development of a building site, "may cause, provide or undertake or make provision with other agencies for the installation, or construction of streets, utilities, parks, playgrounds and other public improvements necessary for carrying out in the project area the redevelopment plan." Thus, the County argues that a redevelopment agency may authorize the construction of a street only in connection with the development of a building site.

We do not read this section as placing such restrictions on a redevelopment agency. As outlined in section 33021, redevelopment includes: "Provision for open-space types of use, such as streets" and "[t]he replanning or redesign or original development of undeveloped areas as to which either of the following conditions exist . . . [t]he areas are stagnant or improperly utilized because of defective or inadequate street layout, faulty lot layout in relation to size, shape, accessibility, or usefulness, or for other causes." In this instance, the Plan identifies the existence of inadequate streets within an industrial area and as previously stated, sets forth how redevelopment would be accomplished. It is entirely within the Agency's authority to make determinations as to the manner in which redevelopment should be implemented. Where extraterritorial jurisdiction is granted, the agency "so authorized may undertake the redevelopment of such area in all respects as if the area was within its territorial limits and its legislative body, agency, and planning commission shall have all the rights, powers, and privileges with respect to such area as if it was within the territorial limits of the community so authorized." (§ 33213.) While the County may presently disagree with the means chosen by the Agency to redevelop the area, the County may not now raise such an objection since the County adopted an ordinance authorizing the City to redevelop the area within the County's jurisdiction.

B. *Accounting Procedures*

In its statement of decision the trial court concluded that the Agency had wrongfully and illegally claimed tax increment revenues on the bases that the Agency had not adopted a separate budget or filed a written annual report and loans which the Agency received from the City were not supported by appropriations in the Agency's budget. The trial court also determined that the County was barred by section 33675[4] and laches from challenging the Agency's past claims for tax increment revenues.

---

[4]Section 33675 provides: "(a) The portion of taxes required to be allocated pursuant to subdivision (b) of Section 33670 shall be allocated and paid to the agency by the county auditor or officer responsible for the payment of taxes into the funds of the respective taxing agencies pursuant to the procedure contained in this section.

"(b) Not later than the first day of October of each year, the agency shall file with the

■ The Agency first argues that section 33080.1 does not require that the Agency's annual report to its legislative body be in writing. Section 33080.1 has been amended several times; however, its general content has remained the same. Under this section as it presently reads, the agency's annual report must include an audit report "conducted in accordance with generally accepted auditing standards," "an opinion of the agency's compliance with laws, regulations, and administrative requirements," a fiscal statement for the previous year, and a description of the agency's activities affecting housing. Given such detailed requirements, the Agency's argument that the report need not be in writing is without merit. The trial court's declaration that the Agency must file annual written reports is affirmed.

■ The Agency next maintains that it is not required to adopt a budget separate from that of the City. Section 33606 states in part that "[a]n agency

county auditor or officer described in subdivision (a) of this section, a statement of indebtedness certified to by the chief fiscal officer of the agency for each redevelopment project, the redevelopment plan for which provides for the division of taxes pursuant to Section 33670.

"(c) The statement of indebtedness shall contain for each such redevelopment project: [¶] (1) The date on which each loan, advance, or indebtedness was incurred or entered into. [¶] (2) The principal amount, term, purpose, and interest rate, of each loan, advance, or indebtedness. [¶] (3) The outstanding balance and amount due or to be paid by the agency of each loan, advance, or indebtedness. The Controller shall prescribe a uniform form of statement of indebtedness.

"(d) The county auditor or officer shall at the same time or times as the payment of taxes into the funds of the respective taxing agencies of the county, allocate and pay the portion of taxes provided by subdivision (b) of Section 33670 to each agency in an amount not to exceed the amount as shown on the agency's statement of indebtedness.

"(e) The statement of indebtedness shall be prima facie evidence of the indebtedness of the agency. If the county auditor or other officer disputes the amount of indebtedness as shown in the statement of indebtedness, the county auditor or other officer shall, within 30 days after receipt of the statement, give written notice to the agency thereof. The agency shall, within 30 days after receipt of such notice, submit such further information as it deems appropriate to substantiate the amount of any indebtedness which has been disputed. If the county auditor or other officer still disputes the amount of indebtedness, final written notice thereof shall be given to the agency and the amount disputed may be withheld from allocation and payment to the agency as provided in subdivision (c) of this section. In such event, the auditor or other officer shall bring an action in the superior court in declaratory relief to determine the matter not later than 90 days after the date of the final notice. The issue in any such action shall involve only the amount of indebtedness, and not the validity of any contract or debt instrument or any expenditures pursuant thereto. Payments to a trustee under a bond resolution or indenture of any kind or payments to a public agency in connection with payments by such public agency pursuant to a lease or bond issue shall not be disputed in any action under this section. Any such action shall be set for trial at the earliest possible date and shall take precedence over all other cases except older matters of the same character. Unless an action is brought within the time provided for herein, the auditor or other officer shall allocate and pay the amount shown on the statement of indebtedness as provided in subdivision (d).

"(f) Nothing in this section shall be construed to permit a challenge to or attack on matters precluded from challenge or attack by reason of Sections 33500 and 33501. However, nothing in this section shall be construed to deny a remedy against the agency otherwise provided by law."

shall adopt an annual budget containing all of the following specific information identifying: [¶] (a) The proposed expenditures of the agency. [¶] (b) The proposed indebtedness to be incurred by the agency. [¶] (c) The anticipated revenues of the agency. [¶] (d) The work program for the coming year, including goals. [¶] (e) An examination of the previous year's achievements and a comparison of the achievements with the goals of the previous year's work program."

Had the City council appointed a separate body to govern the Agency, that body would be required to comply with section 33606. The fact that the City council acts as the governing body does not allow it to incorporate the Agency budget into that of the City. Thus, in order to allow the appropriate fiscal review, the Agency must adopt a budget separate from the City budget.

▇▇ We turn now to the issue of whether the Agency properly claimed tax increment revenues. Since 1977, an agency must prepare a statement of indebtedness in order to claim tax increment revenues. (§ 33675.) In this case, the City loaned money to the Agency each year in September; the Agency then claimed the loan as an indebtedness in applying for tax increment revenues; and the loan from the City was later repaid when the tax increment revenues were received. However, the Agency's statements of indebtedness and the Agency's budgets disclose that substantial tax increment revenues were claimed in excess of any budgeted expenditures. The budgeted expenditures included the total estimated cost of all capital improvement projects shown on the five-year capital improvements program of the Agency's budget. The Agency contends that the revenues were claimed not for a specific project, but to accumulate funds to carry out the entire redevelopment plan.

Section 33603 recognizes the Agency's authority to hold money in reserves or sinking funds. Section 33670, subdivision (b), authorizes an agency to claim tax increment revenues "to pay the principal of and interest on loans, moneys advanced to, or indebtedness (whether funded, refunded, assumed, or otherwise) incurred by such redevelopment agency to finance or refinance, in whole or in part, such redevelopment project." However, section 33606 provides that "[a]ll expenditures and indebtedness of the agency shall be in conformity with the adopted or amended budget." In this case, the claims were made for revenues in excess of budgeted expenditures. Thus, the trial court properly determined that the Agency must change its accounting procedures to comply with the statute.

▇▇ The County objects to the trial court's finding that it was barred from challenging the Agency's past claims for revenues. Section 33675

provides that "if the county auditor or other officer disputes the amount of indebtedness as shown in the statement of indebtedness," then he or she must take specified action within certain time periods prior to bringing an action for declaratory relief. Section 33675 states further that "[t]he issue in any such action shall involve only the amount of indebtedness, and not the validity of any contract or debt instrument or any expenditures pursuant thereto. . . . [N]othing in this section shall be construed to deny a remedy against the agency otherwise provided by law."

In the present case, the County did not give the prescribed notice to the Agency. However, the County argues here, as it did before the trial court, that it is challenging the validity of the debt instrument and thus the provisions of section 33675 do not apply.

We disagree with the County's characterization of its complaint. The complaint in essence involved the amount of indebtedness, thus rendering section 33675 applicable. The illegality of the Agency's actions resulted from the procedures used by the Agency as stated in the statement of decision and was not due to the invalidity of the debt instruments. Substantial evidence supports the trial court's finding to that effect. Furthermore, there is nothing in the evidence to indicate that the indebtedness was incurred for any reason other than to implement redevelopment.

Even assuming the action was not barred by section 33675, there is another basis on which the judgment rests. The trial court concluded the County was barred by the doctrine of laches from challenging the expenditure of tax incremental revenues prior to the filing of the complaint. The court specifically found "it was only after the adoption of Proposition 13 made its economic existence perilous that plaintiff questioned the actions of the said defendants" and the City and the Redevelopment Agency were prejudiced by the County's delay. We find no error.

■■■ The County maintains that the trial court erred in denying an accounting of the interest income realized by the City from the investment of tax increment funds held for the Agency.

A redevelopment agency is an autonomous public entity created to perform certain functions pursuant to the CRL. (§§ 33100, 33122, 33123.) It has access to the service and facilities of various departments of the city or county. (§ 33128.) Section 33603 provides in part that "[a]n agency *may* invest any money held in reserves or sinking funds, or any money not required for immediate disbursement, . . ." (Italics added.)

The trial court found that "Agency funds are not legally required to be invested, and no particular rate of interest is required to be paid, but that

the City must correct its accounting procedures with regard to interest income actually earned on Agency funds." Implicit in this finding is that the City did not invest Agency funds for the years 1973-1974 through 1977-1978. There is sufficient evidence to support such a finding. (*Bancroft-Whitney Co.* v. *McHugh, supra,* 166 Cal. 140, 142.) John Radin, the City's former finance director, testified that between 1973 through 1978 the money allocated to the Westside Industrial Redevelopment Fund would normally have gone into a pool with City funds for investment purposes. However, there was no evidence redevelopment funds were ever actually invested. Pursuant to section 33603, the trial court properly denied an accounting of redevelopment funds for that period.

We next note that there is no dispute between the parties that where interest income has been realized through the investment of redevelopment funds, it should be credited to the Agency and not the City's general funds. The County points out, however, that Comstock's testimony disclosed that there were certain discrepancies in how the City allocated interest income to various funds after 1978. The trial court resolved this factual issue by finding in favor of the City. This portion of the judgment is supported by sufficient evidence and accordingly will not be disturbed on appeal. (*Bancroft-Whitney Co.* v. *McHugh, supra,* 166 Cal. 140, 142.)

The County's remaining contentions are rendered moot by our determination that the plan authorized several street and improvement projects.

The judgment is reversed to the extent that it limits the Westside Industrial Redevelopment Plan to the construction of the Ford Street Extension Project. In all other respects, the judgment is affirmed. Costs on appeal to appellants.

Panelli, P. J., and Brauer, J., concurred.

A petition for a rehearing was denied September 16, 1986, and respondent's petition for review by the Supreme Court was denied December 18, 1986.