Filed 5/6/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Ma.V., et al., Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> M.V., <br><br> Defendant and Appellant. | G059433 <br><br> (Super. Ct. Nos. 19DP1331, 19DP1332, 19DP1333) <br><br> O P I N I O N |

Appeal from orders of the Superior Court of Orange County, Katherine E. Lewis, Judge. Reversed and remanded with instructions.

Pamela Rae Tripp, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Debbie Torrez, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minors.

M.V. (Mother) appeals from the juvenile court's orders sustaining jurisdiction and removing her three children. She contends insufficient evidence supported dependency jurisdiction. Mother also asserts the court's dispositional order was not supported by clear and convincing evidence. We agree with Mother, reverse the court's orders, and remand for further proceedings consistent with this opinion.

FACTS

I. *Detention*

In October 2019, the Orange County Social Services Agency (SSA) filed a petition against Mother and the fathers[1] of their three minor children: Ma.V. (Ma.), Mi.S. (Mi.), and P.S. (P.). The first allegation stated Mother and her then-boyfriend, B.L., engaged in ongoing domestic violence, including a September 2019 incident. The petition also alleged the following: SSA offered Mother voluntary services but she refused to participate; Mother (a veteran) suffered from post-traumatic stress disorder (PTSD), was prescribed medication, and attended mental health therapeutic and psychiatric services monthly; Mother had an unresolved substance abuse problem with marijuana; Ma. was suffering emotional damage because Mother had failed and/or refused to obtain necessary mental health services for Ma.; Mother failed to provide for the basic needs of her children by purchasing marijuana instead of food; Mother had a criminal history for violence; and that Mother and father to Mi. and P., K.S., had a history of yelling; and two additional allegations against the fathers.

In the October 2019 detention report, Ma. described the September 2019 incident that led to this case. Ma. stated she, Mother, and B.L. were all in the car when an argument started. When they got home, Ma. got out of the car then heard Mother screaming. B.L. pinned Mother on the ground, put her in a headlock, and choked her.

---

[1] Fathers are not parties to this appeal.

Neighbors intervened and called the police. Police arrested B.L., and Mother obtained an emergency restraining order (ERO).

Mi. reported B.L. and Mother used to live together, but he did not live there anymore. She was at school when the September 2019 incident occurred, and she came home to police cars. She did not know what happened, other than what her maternal grandmother (Grandmother) told her, which was that they had a fight and B.L. tried to kill Mother.

The youngest child, P., stated he was not home when the incident happened, but Grandmother, Mother, and Ma. told him about it. P. said nothing like that had ever happened before.

SSA's detention report further explained Mother did not renew the ERO against B.L. when it expired on September 16, 2019. On September 27, 2019, B.L. returned to Mother's home and another argument began. He took Mother's cellphone and pushed her to the ground. Police later arrested B.L.

Ma. informed the social worker that she did not feel safe with B.L. in the family home. Ma. also told the social worker that she has suffered from mental health problems for a long time. She was not attending school and intended to drop out. She was not on any medication and was not seeing a therapist. Ma. also stated Mother did not provide food, or water, nor did she provide Grandmother with money for food when she took care of the three children.

SSA interviewed Grandmother. She told the social worker she lived in the same apartment complex as Mother and had been helping care for the children for years. She told the social worker Ma. was rebellious and "talked back." Grandmother stated she did not like B.L., but denied witnessing any domestic violence.

In her interview with SSA, Mother denied the allegations about not providing food, water, or money for Grandmother. She said Ma. had behavioral issues and was refusing to attend school and would not attend therapy. Mother stated she was

3

an Army veteran. She reported she was diagnosed with PTSD and took medication for it. She also attended therapeutic services through the Veterans Administration (VA). She denied any past or current domestic violence and criminal history. She reported she vapes marijuana but not in front of the children. As to the September 2019 incident, Mother explained B.L. was also a veteran with PTSD and he was triggered by the anniversary of an incident where he shot and killed a child during war. Mother further explained B.L. was currently in the hospital.

The detention report also chronicled Mother's efforts to deal with Ma.'s mental health issues by seeking therapy and medication for her when they lived in Virginia and California. Ma. refused to take the medication and continued to refuse therapy. When Ma. made comments about harming herself, Mother would take her to the emergency room. Mother also removed all sharp objects from Ma.

At the initial hearing in October 2019, the juvenile court detained then 16-year-old Ma., 11-year-old Mi., and 10-year old P. from parental custody. The court authorized funding for drug testing, ordered SSA to provide services to reunify the family, and ordered eight hours per week of monitored visitation. Mother informed the court she was already connected to services as a veteran, and the court ordered SSA to assist with those services and not to duplicate VA services. The court also ordered Mother not to discuss the case with the children.

II. *Jurisdiction/Disposition Reports*

In its December 2019 jurisdiction report, SSA described the domestic violence between Mother and B.L. Mother confirmed the September 27, 2019, incident was true.

Ma. reported Mother smoked marijuana in the home, but Mother denied doing so in front of the children. Ma. stated Mother purchased marijuana and rolling papers instead of food and did not give Grandmother money for food. In November 2019, an adult sibling confirmed Ma. had to remind Mother to buy food. The sibling

4

stated, "'My mom's boyfriend is always causing problems. Domestic violence, holes in the walls, he's manipulating my mom. . . . I think the kids are best off here with my grandmother, she's raised all the kids, she loves the kids, she's always there for the kids. My mom has PTSD, anxiety, now[-a-]days it's effecting her, my sister [Ma.] would have to remind her to bring food.'"

Also in November 2019, Grandmother told SSA, "'The effects of PTSD are clear, it doesn't affect her parenting though. I have always been part of their lives. When . . . [K.S.] left, [M]other was more part of the kids['] lives. . . . Mo[ther] has never hit the kids. She's missed treatment, she needs services to address the PTSD, and needs to leave the current boyfriend [B.L.], the current boyfriend is violent.'"

SSA asked Mother about prior referrals, which caused investigations for physical abuse, sexual abuse, and domestic violence, as well as her refusing to participate in voluntary services. She knew about prior investigations, but they were either unfounded or inconclusive, evaluated out, or substantiated against a parent other than Mother.

SSA interviewed Mother about her criminal history consisting of a petty theft charge. She took diapers and formula from a Kmart. She was 19 years old and knew it was wrong. She lamented, "I was young and stupid."

SSA also questioned Mother about the allegation she suffered from mental health issues and was prescribed medication. Mother responded she did have mental health issues but tried to treat it with natural resources. As to the allegation that Mother had an unresolved substance abuse problem with marijuana, she stated "'I don't agree with substance abuse because medical cannabis is not a drug, it saved my life. It's taken me from having to take all those prescription pills for pain and everything and being a zombie to doing nothing with my kids to being able to take them out and being able to, I have this thing where I don't get high, I get normal, where I don't have anxiety. I'm not taking clonopin that was giving me dementia, I was getting really bad, so I don't abuse it,

5

I use it medicinally. The VA is working on using cannabis medically but it's the federal thing. My providers all know that I use it.'"

SSA interviewed Mother about the allegation Ma. suffered from emotional problems and she failed to obtain necessary mental health services for her. Mother disagreed and stated that when Ma. made comments about self-harm, it was Mother who took her to the emergency room. In fact, Mother called SSA for help and felt no one helped her deal with Ma.'s needs, so she handled it herself. She also denied telling Ma. she did not want her residing in her home, but instead told Ma. if she wanted to stay with Grandmother nearby, she could do so.

When questioned about the allegation she did not provide for the children's basic needs including food and water, Mother reported Ma. was a picky eater who demanded specific food items from specific restaurants. Mother stated if she did not buy Ma. what she wanted, Ma. said Mother does not feed her. Grandmother confirmed Ma. was a picky eater and the reason she stayed with her Mother was that she refused to eat Grandmother's cooking.

In a December 2019 addendum report, SSA recommended the juvenile court sustain the petition and remove the children from parental custody. Mother stated she was wearing the drug patch for testing purposes, but it was itchy. She also said, "'I had a lot of anxiety before. I felt everyone was against me but I see now they want what is best for the kids and they don't want that idiot (ex-boyfriend) in my life.'" She confirmed she had started weekly appointments with her therapist and psychiatrist, Dr. Nima Fahimian. The children asked for more visitation time with Mother. The children remained in Grandmother's care.

SSA's next addendum report stated Mother provided SSA with her prescription for medical cannabis effective from December 2, 2018, through December 1, 2019. A later prescription went through January 16, 2021. SSA reported being unable to verify Mother participated in her services through the VA, as the VA social worker stated

she was unable to confirm or deny whether the VA had a valid release from Mother. Mother reported she informed the VA that the social worker would be calling for information about her.

On February 20, 2020, SSA filed another addendum report. The report documented a heated exchange between Mother and the social worker about visitation. Issues of monitoring and scheduling changes came up and Mother was upset about the problems. She indicated the problems had a bad impact on the children who continued to want more visitation with her. It appeared from the text exchanges the conflict was primarily between Mother and the adult sibling who was in charge of monitoring Mother, and Mother feeling the social worker was not supporting her. Eventually, the visitation issue was resolved. The children continued to express wanting more visitation time with their mother. K.S. sent the social worker a screenshot of Mother's Facebook page, which appeared to discuss what the children would say to the judge. K.S. expressed concern the post meant Mother discussed the case with the children, which the court prohibited.

III. *Combined Jurisdiction and Disposition Hearing*

The combined jurisdictional/dispositional hearing began on February 20, 2020. Social worker Neal Smith testified Mother had not had a romantic relationship since he had been assigned to the case. He also stated Mother had not been involved in any sort of domestic violence since the case was filed. Smith further testified Mother had not had any contact with B.L.

Smith admitted Mother had a valid recommendation to use marijuana, and had no concerns she was abusing that recommendation. Mother had never tested positive for any other substances but had missed some of her testing dates. Smith had not asked for an explanation of the missed tests.

Smith confirmed Mother's referrals for domestic violence classes, mental health counseling, drug testing, and parenting classes could be completed through the VA. He testified he had never followed up with Mother to find out what she had learned,

7

or how she may have benefitted from her counseling process. After Mother signed a release, Smith confirmed he called the VA three times to get more information on Mother's treatment, but never sent a letter or an e-mail. He never tried to reach a supervisor or a case manager. He confirmed Mother attended a domestic violence program, and he had no reason to believe Mother did not participate in the other referrals.

As for Ma.'s mental health, Smith stated Mother took her to the hospital on several occasions when needed for treatment. He also admitted he had no evidence to support the allegation Mother verbally threatened or degraded Ma.

Mother testified B.L. victimized her. Mother said he was a fellow veteran with PTSD and she thought she could help him. This was why she originally obtained an ERO, but did not follow through with a permanent order. B.L. was hospitalized for his mental health issue, and she terminated her personal relationship with him.

Mother testified about getting Ma. help for her suicidal thoughts by taking her to the emergency room on several occasions, trying medications which the teenager eventually refused to take, encouraging her to take the medication anyway, and seeking help through therapists. She said Ma. did not want therapy and refused to go.

Mother confirmed she had been attending services through the VA since November 2019 for parenting, domestic violence, and individual counseling. She learned domestic violence was physical, emotional, and financial. She knew she had been a victim of that abuse by B.L.

Mother also testified she saw her psychiatrist, Fahimian, at the VA at least once per month. Fahimian monitored her medication and provided her with additional therapy if there were any issues she needed to discuss. Without objection, Mother's counsel offered her consent/release of health information signed on February 1, 2020, allowing SSA to speak to her service providers at the VA. Mother also testified she spoke to Fahimian about the need for her social worker to speak to him. She had no objection to SSA doing so.

8

The juvenile court continued the hearing, and in May 2020, SSA reported it received a letter from Fahimian confirming Mother remained compliant with medication and treatment recommendations and was under her continual care. SSA approved Mother for unmonitored visitation. The children reported visits were going very well and they had no concerns about having overnight visits with Mother.

In July 2020, Mother's testimony resumed, and she stated her children had benefitted from seeing the changes in her and that she was "Mom" again. On the record, counsel confirmed there was no ordered service plan, just recommended services.

Also in July 2020, Smith testified SSA planned to conditionally return the children to the Mother, as the caregiver and the children all reported there had been no problems with Mother and her parenting. Smith testified SSA was not concerned Mother's marijuana use put the children at risk, but did have a problem that she posted about her marijuana use on her public Facebook page, as well as negative or angry posts about K.S. and SSA.

Smith stated an inspection of Mother's home revealed no safety concerns and there was plenty of food in the kitchen. There were no reports of Mother buying marijuana instead of food. Mother continued to report she attended therapy at the VA, but SSA had a problem getting any detailed information from Mother's therapist. Smith testified that in the previous five months, he had not tried to reach the therapist after the initial two attempts. While SSA appeared ready to return children to Mother, she had a two-week trip planned to Mexico, so they did not want to return the children until after the trip. SSA did not ask Mother if she had other trips planned after she returned from Mexico.

IV. *Ruling*

The juvenile court made the following findings as to jurisdiction. It sustained the allegation B.L. physically assaulted Mother twice and she thereafter let him back into her family home. The court conceded the allegation had aged out and Mother

9

had evolved and recognized and verbalized that she was a victim of domestic violence. Nevertheless, the court determined "that we have no verification as to that it has or that she's actually been involved in services, to get her to a place where not only she recognizes that at this point, but also that she will see the red flags to avoid having that kind of relationship in the future. [¶] So, [the] court does believe that the allegation . . . is true. And the court feels that even though it was an old situation, that it is still relevant and still bears reflection and concern with respect to the children at this time."

The juvenile court found true SSA offered Mother voluntary services and she declined. It also found true Mother may have an unresolved substance abuse problem that includes, but may be limited to marijuana, and Mother bought marijuana instead of purchasing food for the family. The court amended the petition, however, because it found that using cannabis may be completely appropriate as Mother testified it helped her withdraw from much stronger medication. The court also struck the word "buys" marijuana instead of food, stating it had no idea how frequently that happened. The court dismissed the allegation Mother failed to provide for the basic needs of the children including buying marijuana instead of food. The court also found true the allegation Mother and K.S. "have a history of yelling," finding specifically there was no evidence of any current or former domestic violence.

The juvenile court then ruled on the disposition of the case. The court did not find Mother's testimony credible. Mother's testimony regarding a release of information with the VA differed from the social worker's and the court believed the social worker. Early on, Mother demonstrated a lack of credibility by falsely indicating Grandmother had leukemia to explain why the children did not reside with her.

The juvenile court found a substantial risk of harm to return the children to Mother based on the history of domestic violence and Mother's neglect of Ma.'s mental health. Mother did not demonstrate she had dealt with or had a plan as to how to deal with Ma.'s mental health. The court was concerned for Ma.'s wellbeing if she were

10

returned to Mother's care. It also determined Mother lacked insight and she had recently indicated that the children were to blame for the court's involvement. The juvenile court also found no reasonable efforts could keep the children safe in Mother's care.

At the detention hearing, the juvenile court ordered Mother be allowed to participate in services at the VA. However, Mother put up several hurdles barring the court or social services from verifying her participation in services she claimed she had done. The court did not have faith Mother participated in services to address domestic violence or the concerns that brought the children before the court.

The juvenile court determined no reasonable efforts could be put in place to ensure the children's safety with Mother. The court held by clear and convincing evidence there was a substantial risk of harm based on the "historical issue of domestic violence" and the court's finding "there's no indication that mother has dealt with this." The court concluded Mother neglected Ma.'s mental health needs and she "thwarted" the efforts of SSA to confirm she was participating in services through the VA. The court removed the children from Mother's custody pursuant to Welfare and Institutions Code section 361.[2]

## DISCUSSION

Mother contends the juvenile court lacked substantial evidence to support its jurisdictional findings. She also asserts the court erred by removing her three children at the dispositional hearing because there was insufficient evidence there were no other means to protect the children absent their removal. We agree with Mother on both issues.

II. *Jurisdiction*

At their essence, the juvenile court's jurisdictional rulings focused on old issues that were resolved by the time of the jurisdictional hearing—10 full months after

---

[2]     All further statutory references are to the Welfare and Institutions Code.

11

the children were removed from Mother's care.  The evidence simply did not support the required findings under section 300, subdivisions (b), (c), and (j).  This was error.

Section 300, subdivision (b)(1), applies where "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child, . . . or by the willful or negligent failure of the parent . . . to provide the child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent . . . to provide regular care for the child due to the parent's . . . mental illness, developmental disability, or substance abuse."  The three part test for jurisdiction under section 300, subdivision (b)(1) includes:  (1) inability to provide the necessary supervision or protection of children; (2) causation; (3) serious physical harm or illness, or the substantial risk of either.  (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 820 (*Rocco M.*), overruled in part by *In re R.T.* (2017) 3 Cal.5th 622, 626-627 (*R.T.*).)

Section 300, subdivision (c), applies where "[t]he child is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the parent . . . or who has no parent . . . capable of providing appropriate care."  "The statute thus sanctions intervention by the dependency system in two situations:  (1) when parental action or inaction causes the emotional harm, i.e., when parental fault can be shown; and (2) when the child is suffering serious emotional damage due to no parental fault or neglect, but the parent or parents are unable themselves to provide adequate mental health treatment."  (*In re Alexander K.* (1993) 14 Cal.App.4th 549, 557.)  Section 300, subdivision (j), applies when "[t]he child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions."  (§ 300, subd. (j).)

12

The standard of proof for jurisdiction is preponderance of the evidence. (*In re Jennifer V.* (1988) 197 Cal.App.3d 1206, 1211.) The juvenile court's jurisdictional and dispositional findings must be upheld if supported by substantial evidence. (*R.T.*, *supra*, 3 Cal.5th at p. 633.) Substantial evidence indicates more than a smidgeon or trace; it must be meaningful and significant and cannot be merely speculative. (*County of Santa Cruz v. City of Watsonville* (1985) 177 Cal.App.3d 831, 845.)

SSA argues the juvenile court's jurisdictional findings were supported by substantial evidence. It asserts there was "ample evidence to find Mother exposed the children to domestic violence and she had a history of abusive relationships. In addition, Mother used marijuana in the home, and failed to attend to [Ma.] who was suffering emotional harm due to untreated mental health problems." This stale evidence was insufficient to support the court's jurisdictional findings.

We start with the evidence of domestic violence. It was undisputed the perpetrator of the violence against the Mother, B.L., had left the family home and Mother had ended her relationship with him. The same was still true 10 months later, Mother had no contact with B.L. She also had not engaged in any new romantic relationships. The juvenile court conceded the domestic violence issue "was an old situation" but nevertheless stated "it is still relevant and still bears reflection and concern with respect to the children at this time." It further explained while the domestic violence allegation had aged out, and even though Mother recognized and verbalized she was a victim of domestic violence, "we have no verification as to that it has or that she's actually involved in services, to get her to a place where not only she recognizes that at this point, but also that she will see the red flags to avoid having that kind of relationship in the future."

"While evidence of past conduct may be probative of current conditions, the question under section 300 is whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm. [Citations.] Thus the past infliction of physical

13

harm by a caretaker, standing alone, does not establish a substantial risk of physical harm; '[t]here must be some reason to believe the acts may continue in the future.' [Citations.]" (*Rocco M.*, *supra*, 1 Cal.App.4th at p. 824, fn. omitted.) The juvenile court's focus on Mother's past as a victim of domestic violence, which had not occurred again during the 10 months the case was pending, and not a current risk, was error.

As for Mother's substance use, she candidly admitted marijuana eased her PTSD symptoms to avoid using other drugs. Mother had a valid prescription to use marijuana, and Mother's use of marijuana was no longer a real concern to SSA, which was established through Smith's testimony, who the court found credible. This evidence did not demonstrate a current risk to the children.

What we deem the most serious concern was that of Ma.'s mental health. However, throughout the 10 months prior to the jurisdictional hearing, SSA did not place Ma. in individual therapy, nor did she suffer any mental health breakdowns. Tellingly, Ma. testified Mother took her to the hospital when she had thoughts of self-harm in the past. In fact, at the jurisdictional hearing, Ma. testified she was not afraid of Mother and enjoyed their time together.

Because of the pandemic, Mother had an unusually long amount of time before the jurisdiction hearing. In that time, Mother resolved the key concerns warranting jurisdiction. After considering all the evidence, we find it insufficient at the time of the jurisdictional hearing to determine any of the children would have been at risk if Mother had maintained legal custody.[3]

II. *Disposition*

Mother asserts there was insufficient evidence that met the clear and convincing standard of proof necessary to have her children removed. We agree.

---

[3] Our reversal of the juvenile court's jurisdictional order would normally end our analysis. In this case, however, we also consider the dispositional order because it warrants discussion of important issues, and to provide guidance for future cases.

"'[I]n dependency proceedings the burden of proof is substantially greater at the dispositional phase than it is at the jurisdictional phase if the minor is to be removed from his or her home. [Citations.]'" (*In re Isayah C.* (2004) 118 Cal.App.4th 684, 694.) The burden of proof at the jurisdictional phase is preponderance of the evidence; the burden of proof at disposition is clear and convincing evidence. (*Ibid.*; see also § 355, subd. (a) [jurisdiction findings by preponderance of evidence]; § 361, subd. (c) [disposition findings by clear and convincing evidence].) "This heightened burden of proof [at disposition] is appropriate in light of the constitutionally protected rights of parents to the care, custody and management of the children. [Citation.]" (*In re Basilio T.* (1992) 4 Cal.App.4th 155, 169.)

"Maintenance of the familial bond between children and parents—even imperfect or separated parents—comports with our highest values and usually best serves the interests of parents, children, family, and community." (*In re Henry V.* (2004) 119 Cal.App.4th 522, 530.) "'Of course, on appeal the substantial evidence test is the appropriate standard of review. Thus, in assessing this assignment of error, "the substantial evidence test applies to determine the existence of the clear and convincing standard of proof . . . ." [Citations.]'" (*Id.* at p. 529.)

The juvenile court justified its removal order by finding Mother was uncooperative with SSA and determining Mother was to blame that the social worker did not fully interview her VA service providers. The court placed no burden on SSA to have looked further for information to support their petition. It is undisputed Mother executed a release months before the hearing for SSA to contact the VA providers. Admittedly, the VA may not be the easiest bureaucracy to work with, but it was incumbent upon SSA to obtain the information, which it failed to do. We see no reason to hold this against Mother.

Furthermore, SSA admits Mother's services were voluntary. Mother had no obligation to complete a verified case plan. The juvenile court's analysis relied

15

heavily on Mother's completion of the recommended case plan. Which, as noted above, was difficult to discern because SSA failed to adequately interview the VA service providers. In any event, such a review is more appropriate when services have been court ordered.

SSA documented the stability of the children, their constant requests to have more time with Mother, and the lack of any domestic violence incidents or abuse of substances for over 10 months in this case. Additionally, the family was in a unique situation that appeared to be especially beneficial to the children. Grandmother and Mother lived in the same apartment complex. The children could spend time at both homes. Grandmother previously cared for the children when Mother was deployed, so she stood in a parental role. This was clear evidence there were reasonable means to prevent removal as Mother already had a plan in place for Grandmother to help care for the children. This plan could have been maintained and removal, which is to be a last resort, could have been avoided. We also note from a practical perspective, Mother managed to improve her situation during a year that was stressful and difficult under the best of circumstances. The dependency scheme demands that orders are made based on current risk and in this case, due to the multiple continuances and the court's pandemic-related closure, the earlier issues had aged out.

As to the juvenile court making multiple findings Mother was not cooperative with the SSA, it is entirely expected parents may not be happy to have governmental interference in their private lives. The ability of a parent to get along with a social worker is not evidence from which a removal order can be supported. (*In re Jasmine G.* (2000) 82 Cal.App.4th 282, 290.) While a social worker or juvenile court may feel more comfortable and confident about a parent who is friendly and gets along with them, that is not what the law requires. Social workers and bench officers are professionals who are specially trained to deal with difficult or demanding personalities.

16

Indeed, it is difficult to imagine a more extreme emotional situation than the prospect of losing your children.

The court in this case was critical of Mother for avoiding "many, many opportunities" to do services and show she did not need supervision. It also commented Mother "put up several hurdles and roadblocks to the court or social services," and that Mother had "defied supervision." Yet, SSA interviewed Mother for all 11 addendum reports and she answered questions posed by the social workers and even volunteered information not requested. The evidence was insufficient by a clear and convincing standard to remove the children from Mother's care, custody, and control.

We note in closing this court has observed a recent, and troubling trend, of what we perceive as mothers being punished as victims of domestic violence. (See *In re I.B.* (2020) 53 Cal.App.5th 133 (*I.B.*); *M.G. v. Superior Court of Orange County* (2020) 46 Cal.App.5th 646.) We recognize issues of domestic violence often put children at risk. The cases we refer to, however, are akin to this one, where children are brought into the dependency system because of domestic violence between the mother and a romantic partner. (*Ibid.*) Even after a mother manages to distance herself from the abuser, however, SSA and the juvenile court continue to use the history of domestic violence as a basis to remove the children. Indeed, it seems as if once a woman is battered, she will forever be faced with losing her children. This is not the legal test. "When evaluating the complexity of domestic violence relationships, not every case will be the same. Unlike drug and alcohol addiction, there are no Alcoholics Anonymous (AA) meeting cards, coins, or clean tests to measure success [as a victim of domestic abuse]." (*I.B.*, *supra*, 53 Cal.App.5th at p. 156.)

We are also mindful of society's preconceptions that often damage the "credibility of victim-witnesses who present on the stand in atypical and non-paradigmatic fashions." (Kohn, Barriers to Reliable Credibility Assessments: Domestic Violence Victim-Witnesses (2003) 11 Am. U. J. Gender Soc. Pol'y & L. 733, 734, fn.

omitted.)  We expect such victims to be "sweet, kind, demure, blameless, frightened, and helpless" (*id.* at p. 734) and not a "not a multi-faceted woman who may or may not experience fear or anger" (*id.* at pp. 743-744, fn. omitted).  "These are the preconceptions that judges and jurors bring with them into the courtroom when they assess the veracity of a victim-witness's story."  (*Id.* at p. 734, fn. omitted.)  We encourage continued diligence and education to guard against such preconceptions.

DISPOSITION

The orders are reversed.  Because we determine the juvenile court's jurisdictional order was not supported by sufficient evidence, we remand the matter for a continued jurisdictional hearing.  The hearing shall be held as soon as possible, consistent with the right of all sides to prepare their case.

O'LEARY, P. J.

WE CONCUR:

THOMPSON, J.

GOETHALS, J.