Filed 6/26/24  In re S.T. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re S.T. et al., Persons Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> Y.Y., <br><br> Defendant and Appellant. | F087133 <br><br> (Fresno Super. Ct. Nos. 23CEJ300207-1, 23CEJ300207-2, 23CEJ300207-3, 23CEJ300207-4, 23CEJ300207-5, 23CEJ300207-6) <br><br><br> **ORDER MODIFYING OPINION** <br> [NO CHANGE IN JUDGMENT] |

**THE COURT:**

It is ordered that the opinion filed herein on June 17, 2024, be modified as follows:

1. On page 1, the second paragraph beginning with "Laurel Thorpe" is deleted and replaced with:

    Susan M. O'Brien, under appointment by the Court of Appeal, for Defendant and Appellant.

Except for the modification set forth, the opinion previously filed remains unchanged.  This modification does not effect a change in the judgment.

FRANSON, A.P.J.

WE CONCUR:

PEÑA, J.

SMITH, J.

Filed 6/17/24  In re S.T. CA5 (unmodified opinion)

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re S.T. et al., Persons Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>Y.Y.,<br><br>    Defendant and Appellant. | F087133<br><br>(Super. Ct. Nos. 23CEJ300207-1, 23CEJ300207-2, 23CEJ300207-3, 23CEJ300207-4, 23CEJ300207-5, 23CEJ300207-6)<br><br>**OPINION** |

## THE COURT[*]

APPEAL from an order of the Superior Court of Fresno County.  Amythest Freeman, Judge.

Laurel Thorpe, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel C. Cederborg, County Counsel, and Lisa R. Flores, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Franson, Acting P. J., Peña, J. and Smith, J.

Appellant, Y.Y. (mother), contends on appeal that the juvenile court's dispositional order must be reversed and remanded because there is insufficient evidence to support its order to remove her three younger children (child 4, child 5, and child 6) from her care under Welfare and Institutions Code section 361, subdivision (c)(1).[1] We reverse and remand the court's order as to mother and her request for family maintenance for children 4, 5, and 6. In all other respects, the order is affirmed.

## INTRODUCTION

Mother and P.T. (father) have been "culturally"[2] married for 22 years and have seven children together: a 21-year-old adult (S.T.), a 16-year-old boy (child 1), a 14-year-old girl (child 2), a 12-year-old boy (child 3), an eight-year-old boy (child 4), a five-year-old boy (child 5), and a three-year-old girl (child 6).[3] The entire family resided together.

On July 30, 2023, child 2 disclosed father had been sexually molesting her for the past two years. Police investigated and contacted the Fresno County Department of Social Services (the department). The children were removed from the home by the department. The three older children, child 1, child 2, and child 3, were sent to one foster family. The three younger children, child 4, child 5, and child 6, were sent to another foster family. S.T. continued to live at the family home with mother and father.

Initially, mother did not believe child 2's accusations against father and continued to live with him. Mother blamed child 2 for "ruin[ing]" the family. However,

---

[1] All statutory references are to the Welfare and Institutions Code.

[2] Mother and father never legally married but claimed to be "culturally" married according to traditional Khmer customs.

[3] The children all have similar initials. To avoid confusion, we refer to them as child 1, child 2, child 3, child 4, child 5, and child 6, from oldest to youngest, and refer to all six collectively as the children. The children's older, adult brother is referred to as S.T.

2.

approximately two weeks later, mother wrote a letter apologizing to child 2 and stated she believed the accusations against father. She stated she had separated from father and that he had moved out of the family home.

The three older children, children 1, 2, and 3, did not believe mother's claim that she had separated from father and remained angry with her over her initial disbelief of child 2, so they refused visits with her and did not wish to be returned to her care.

Mother requested the three younger children, children 4, 5, and 6, be returned to her under a family maintenance program. Mother testified at the November 6, 2023 disposition hearing that she also wanted to reunify with children 1, 2, and 3, but did not want to force them if they did not want to.

At the November 6, 2023 disposition hearing, the juvenile court found the children to be wards of the court pursuant to section 300, subdivisions (b) and (d), and ordered removal of the children pursuant to section 361, subdivision (c)(1), as recommended by the department, finding "clear and convincing evidence that continuance of the children in the home … was contrary to the children's welfare and there is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the children" if they were to be returned to the parents' home, and that there were "no reasonable means by which the [children]" could be protected without removal. The court ordered family reunification services for mother.

Mother appealed the juvenile court's order ordering removal of the children and denying her request for family maintenance services for children 4, 5 and 6.

**FACTUAL AND PROCEDURAL SUMMARY**

On July 30, 2023, child 2, a 14-year-old girl, disclosed father had been sexually abusing her for two years. She alleged he had fondled and licked her breasts and digitally penetrated her vagina area for the last two years. She reported the last incident happened a month prior.

The Fresno Police Department dispatched an officer to the family's home to speak with child 2 about the report. At the home, father did not want to allow the officer to speak to child 2 and denied law enforcement entry to the home. The officer placed a protective hold on the children and contacted the department. A social worker arrived at the home and removed the children, placing them with their paternal uncle and his wife. The children's older brother, S.T., was 21 years old at the time and remained in the home.

The next day, July 31, 2023, a social work practitioner, S.R., spoke with five of the children at the paternal uncle's home. She did not speak to three-year-old child 6 due to her young age.

The children, with the exception of child 6, all denied domestic violence occurred in the home and denied any corporal punishment by their parents besides a light slap on the hand.

Child 5, five years old, and child 4, eight years old, reported feeling safe in the home and not afraid of anyone. They described their parents as "fun and caring." They and 12-year-old child 3 denied ever being touched inappropriately.

Child 2 told S.R. she got along well with her mother but felt distant from her, and felt "really distant" from her father. She denied being spanked or hit, and denied domestic violence occurred in the home. She denied drug use in the home, and reported her father sometimes drank on weekends and her mother only occasionally drank. She reported that when father drank, he would act "weird and different" and "more aggressive," yelling at mother. Child 2 said she did not like father and was afraid of him, stating he yelled at her more than her siblings. When asked if she felt safe or unsafe in the home, she stated she felt "uncomfortable."

S.R. asked child 2 if father "did bad touch on her." Child 2 nodded and began to cry. She denied mother had any knowledge of it. She stated she did not want to see father and was not sure if she wanted to go home, even if father was removed, because

4.

"my mom will be against me for this." Child 2 said she would prefer to be in foster care rather than live with her paternal uncle because he spoke to her parents often.

S.R. then spoke to 16-year-old child 1. He stated he got along well with both parents and confirmed there was no spanking or domestic violence in the home. He stated child 2 never reported the sexual abuse to him.

Child 1 then told S.R. that his older brother S.T. called him earlier that day and asked if he wanted snacks. S.T. told him that mother said she was not going to get any snacks for child 2. S.R. asked child 1 why his mother would say this to S.T. Child 1 stated he believed mother was "antagonizing and blaming [child 2] for the incident" and that he did not like that mother was " 'shutting' [child 2] out because 'we don't know the truth yet.' " Child 1 stated child 2 was not known to lie and asked, "Why would she lie about this?" He stated he did not know who to believe, but said he knew this type of thing happened in some families, and that it was difficult for victims to speak out. He stated he wanted to believe his sister.

S.R. asked the paternal uncle and his wife about the snack incident, and they denied having any concerns with the parents.

S.R. then spoke to mother, father, and S.T. Mother stated she did not believe the sexual abuse of child 2 could be true, and denied child 2 had ever been alone with father until mother began working the graveyard shift a few months prior to child 2's disclosure. S.R. told mother and father the "criminal investigation could not be discussed."

S.R. asked mother about child 1's statement that S.T. said mother was not going to get child 2 snacks but was getting snacks for the other children. Mother denied she would retaliate against child 2 or treat her differently than the other children, and denied saying that "it was [child 2's] fault."

5.

On August 1, 2023, three days after the children had been removed from the home, a team decision meeting was held. A Khmer translator assisted the paternal uncle and his wife. The facilitator reported details on the removal would not be addressed because it was an open criminal investigation. Father stated the children needed to be home where they belonged and asked why he could not see them. The uncle stated he was no longer able to provide care for the children. Mother and father suggested other options, including that father would remove himself from the home, or both parents would remove themselves from the home and the children would be placed under the care and supervision of their older brother S.T.

After the meeting, the children were placed in resource family homes. The three older children (children 1, 2, and 3) were placed together in a resource family home. The three younger children (children 4, 5, and 6) were placed together in another resource family home.

***Section 300 Petitions***

On August 1, 2023, the department filed identical dependency petitions for the children, alleging they came within the provisions of section 300, subdivisions (b) and (d). The petitions alleged: mother failed to protect the children from father's sexual abuse (§ 300, subd. (b)(1); count b–1); father failed to protect the children from his sexual abuse of child 2 (§ 300, subd. (b)(1); count b–2); child 2 was sexually abused by father (§ 300, subd. (d); count d–1); mother failed to protect child 2 from father's sexual abuse (§ 300, subd. (d); count d–2); the other children were at substantial risk of abuse because father abused child 2 (§ 300, subd. (d); count d–3); and the children were at substantial risk of sexual abuse by father because mother was unable to and failed to protect child 2 from father's abuse (§ 300, subd. (d)(4); count d–4).

The petition further stated as to the counts against mother:

6.

"b–1: [Mother] has failed to provide adequate care[,] supervision[,] and protection to [the] children from [father]. [Father] had sexually abused [child 2]. On or about July 2023, [child 2] disclosed [father] had been fondling and licking her breasts and digitally penetrated her vaginal area for the last two years. [Mother] does not believe [child 2], thus placing the child at substantial risk of further sexual abuse. [¶] … [¶]

"d–2: [Mother] has failed to protect [child 2] from being sexually abused by [father]. On or about July 2023, [child 2] disclosed [father] had been fondling and licking her breasts and digitally penetrated her vagina area for the last two years. [Mother] does not believe [child 2], thus placing the child at substantial risk for further sexual abuse. [¶] … [¶]

"d-4: [The children] are at substantial risk of being sexually abused by [father] in that [mother] is unable to protect the children. [Mother] failed to protect the children's sibling [child 2] from [father] in that [father] sexually abused [child 2]. [Mother] knew or reasonabl[y] should have known [child 2] was in danger of being sexually abuse[d]. On or about July 2023, [child 2] disclosed [father] had been fondling and licking her breasts and digitally penetrated her vagina area for the last two years. [Mother] does not believe [child 2], thus placing the child at substantial risk for further sexual abuse."

### *August 2, 2023 Detention Hearing*

On August 2, 2023, the juvenile court held a detention hearing. The court found a prima facie showing had been made that the children were described by section 300, subdivisions (b) and (d). It confirmed father was the father of the children, and ordered services including mental health assessments, domestic violence assessments, and parenting classes for mother and father. The court ordered supervised visits for children 1, 2, 3, 4, and 5 with mother at least once per week, and two supervised visits per week between mother and child 6. It ordered supervised visits of at least once per week between father and children 1, 3, 4, and 5, and two supervised visits per week between father and child 6. Child 2 was to not have any contact with father. The court ordered the parents not to discuss issues of removal or future placement with the children.

*ICWA*

On July 31, 2023, the department questioned mother, father, S.T., and the paternal uncle and his wife about knowledge of any familial Native American heritage, which they denied. The parents also denied there were any other relatives to speak to regarding potential Native American ancestry. At the August 2, 2023 detention hearing, the juvenile court accepted the parents' ICWA-020 forms denying Native American ancestry and the parents confirmed their denial of Native American ancestry. The parents' ICWA-020 forms were filed with the court.

*August 24, 2023 Jurisdiction/Disposition Report*

The department's August 24, 2023 report stated that on August 11, 2023, social worker N.D. spoke to mother. Mother stated she now believed child 2's sexual abuse allegation against father. However, she did not believe that it had been occurring for two years, as she said she was always at home until she recently began working the graveyard shift. Mother confirmed she and father were still living together and did not plan to separate. Father continued to deny the allegations of sexual abuse.

The report stated that on August 16, 2023, N.D. spoke to children 4, 5, and 6. They all reported that they wanted to return home to mother and father.

The report stated that on August 18, 2023, N.D. again spoke to mother. Mother reported she had separated from father and that he was no longer living at the family's home. Father confirmed this but told N.D. he did not have a "steady address" when she asked for his new address.

The report stated that on August 21, 2023, N.D. spoke to child 2. Child 2 reported she did not want to visit or reunify with either of her parents because she felt "uncomfortable" with them.

N.D. also spoke to child 1, who reported mother took father's side, and that he did not want to return to her care until she separated from father and apologized to child 2.

8.

N.D. told child 1 that his mother told her she had separated from father. Child 1 told N.D. he did not believe mother because she had taken father's side over her own children when she heard the allegations against father. Child 1 stated he believed mother was "just saying she has separated" to have the children returned to her care.

Child 3 reported to N.D. he wanted to return home, but "after knowing the allegations" against father, he did not want to visit or reunify with his parents. Child 3 stated that mother sent a text message to him asking, "Is [child 2] happy she ruined our family?" Child 3 began to cry and reported to N.D. that he felt hurt because his sister was the victim and he felt betrayed by father because he was supposed to protect his children but instead hurt child 2.

Despite the juvenile court ordering visits between mother and the children, children 1, 2, and 3 refused to visit with her, and because they were not placed in the same resource family home as children 4, 5, and 6, sibling visits also did not take place. N.D. reported she was "working with the care provider to set up [separate] sibling visits."

The department reported mother and father had been cooperative, were not dependent on alcohol or drugs, met the children's needs in the past, had no known prior child welfare records, and had employable skills. Mother reported having a strong relationship with her children and said the family "does everything together."

*Summary Recommendation*

N.D. wrote as the "Summary Recommendation" of the report that "the children be adjudged dependents of the juvenile court, and that they remain placed in out-of-home placement." The report stated,

> "There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the children … if the children were returned home and there are no reasonable means by which the children's physical health can be protected without removing the children from the parent[']s … physical custody.

"[Mother] has failed to provide adequate care, supervision, and protection for her children which resulted in [child 2] having been sexually abused by [father] .…   [Mother] has not ameliorated the reasons that led to the children's removal from her care.  The [department] is worried [mother] will allow [father] to remain in the home and will not be able to provide [the] children with adequate care, supervision[,] and protection, which would place the children at substantial risk of suffering serious physical harm, sexual abuse, and or illness if the children were left in [mother's] care at this time.  Therefore, the [department] recommends the children not return to [mother's] care at his time and recommends [mother] be provided [f]amily [r]eunification [s]ervices."

*Reasonable Efforts*

The section of the report entitled "Reasonable Efforts" stated the juvenile court ordered parenting classes, mental health assessments, domestic violence assessments, and recommended treatment services be provided to the parents.

*Family Compliance with Services*

Under the section "Family Compliance with Services," the report stated mother attended a concurrent planning orientation on August 11, 2023, and a domestic violence assessment on August 15, 2023, had a mental health assessment scheduled on August 29, 2023, and was on a waiting list for parenting classes.

*Assessment/Evaluation*

The report's "Assessment/Evaluation" section stated,

"Based on the aforementioned evidence[,] the [department] recommends the petition be sustained and [the children] are found to be persons described by [section] 300[, subdivisions] (b) and (d).

"[Mother] has failed to provide adequate care, supervision, and protection for [the] children, which resulted in [child 2] having been sexually abused by [father] for the past two years .…   [Mother] has not ameliorated the reasons that led to the children's removal from her care.  The [department] is worried [mother] will allow [father] to remain in the home and will not be able to provide [the] children with adequate care, supervision[,] and protection, which would place the children at substantial risk of suffering serious physical harm, sexual abuse, and or illness if the children were left in [mother's] care at this time.  Therefore, the

10.

[department] recommends the children not return to [mother's] care at this time and recommends [mother] be provided [f]amily [r]eunification [s]ervices. The prognosis of [mother] reunifying with the children [in] 12 months appears to be guarded at this time. However, should [mother] engage in the case plan, the prognosis of her reunifying with the children in 12 months would improve."

The department recommended mother be ordered to participate in family reunification services, including parenting classes, a mental health assessment and a domestic violence assessment, and participate in treatment as recommended by the assessments. The department recommended father not receive family reunification services pursuant to section 361.5, subdivision (b)(6) (infliction of severe sexual abuse).

***Jurisdictional Hearing***

On August 30, 2023, the juvenile court held a jurisdictional hearing. Mother's counsel provided two handwritten letters to the court, which were received without objection.

The first letter stated,

"To [child 3], [¶] Mommy sorry for texting you and ask [child 2] if she was happy and break up our family. I shouldn't ask that kind of question. I don't really mean it and I am sorry. Mommy apologize for everything. I regret my actions and any pain or inconvenience they may have caused you. I am sorry for any distress I may have caused. Mommy love you!!!"

The second letter stated,

"To [child 2], [¶] I am writing the letter to you because I was unable to express my feelings to you face to face. I am extremely sorry I didn't believe you at first. I was wrong for doing that. I am sorry will you please forgive me and if you don't that's okay but if you do it would make me very very happy. Mommy love you!!!"

Department counsel and counsel for the children submitted on the issue of jurisdiction on the basis of the department's report and recommendations. Mother's

counsel requested dismissal of counts d–2 and d–4. The juvenile court took the matter under advisement until September 13, 2023.

*September 13, 2023 Ruling*

On September 13, 2023, the juvenile court dismissed counts d–2 and d–4 against mother, finding they were not proven by a preponderance of evidence. Count d–2 alleged mother failed to protect child 2 from father's sexual abuse (§ 300, subd. (d)) and count d– 4 alleged the children were at substantial risk of sexual abuse by father because mother was unable to and failed to protect child 2 from father's abuse (§ 300, subd. (d)(4); count d–4). The court sustained the remainder of the petition against mother and father, finding the children were described by section 300, subdivisions (b) and (d). The remaining allegation against mother was count b–1, that mother failed to protect the children from father's sexual abuse (§ 300, subd. (b)(1)). In dismissing counts d–2 and d–4 against mother, the court noted it considered the evidence in the report and "heavily" considered child 2's statement she "never told her mother about the abuse until the day of disclosure to law enforcement." The court stated,

> "While mother's reaction on that day was disappointing and some of the comments that she made caused damage to her family, not just the victim of the sexual assault but the other members of the family who were affected by the failure of her to believe her daughter and to prioritize her daughter's safety at that time, … there is no evidence that [mother] should have reasonably [known] that the sexual abuse was going on until that day."

Mother requested children 4, 5, and 6 be returned to her under a family maintenance program. Father contested the recommendation to deny him reunification services. The juvenile court calendared a contested disposition hearing for November 6, 2023.

12.

*October 17, 2023 Addendum Report*

On October 17, 2023, the department filed an addendum report. It stated under the heading "Current Circumstances" that mother was residing in the family home without father since separating from him, and that father had not had stable housing since he left the family home.

The department reported mother maintained good communication with the department, regularly checking in with the social worker to inquire about the children's well-being, and regularly attended school conferences and dental appointments with the children's caregivers. It stated mother was participating in parenting classes and completed the mental health assessment and domestic violence assessment.

Children 1, 2, and 3 continued to refuse visits with either parent.

The department's assessments and recommendations did not change and stated all the children should continue to remain in out-of-home care.

*November 3, 2023 Addendum Report*

On November 3, 2023, the department filed a second addendum report. It addressed mother's October 17, 2023 request that the department consider placing children 4, 5, and 6 in the home with her adult son S.T. if she moved out of the home. The social worker reported she was unable to get in contact with S.T. regarding mother's request because he did not return her phone call or respond to her text message. The report did not address mother's progress with her service plan.

The report stated that on October 24, 2023, social worker N.D. contacted children 1, 2, and 3. They reported that S.T. told them mother was still seeing father and would leave the home on "multiple days for long hours during the day after work." The three children stated they felt uncomfortable with their younger siblings, children 4, 5, and 6, being placed with S.T. because he told them mother continued to see father. The report stated children 1, 2, and 3 believed mother said she separated from father but

13.

would "be back with him once [the children were] returned to her care." The report stated the three older children also expressed concern that S.T. told them their maternal grandfather had moved into the family home with mother and S.T. They stated they witnessed the grandfather physically assault their mother while she was pregnant several years prior.[4]

The report stated that on October 26, 2023, social worker N.D. asked mother if she continued to have a relationship with father. Mother denied being in a romantic relationship with him, and stated she only saw him to "pick up monetary assistance." N.D. told mother it was her decision if she wanted to remain romantically involved with father, but the department would have to assess the safety of the children in the home, if so. Mother apologized for seeing father and said she did not want to do anything to jeopardize reunification with the children. N.D. told mother she was "only" assessing, and if mother was receiving monetary assistance from father, she could continue to do so. Mother told N.D. that in the future, she would send S.T. to pick up the money from father, instead of getting it from him herself.

The report stated that on November 2, 2023, N.D. informed mother the department determined it would not place the children with S.T. because he was only 21 years old, worked part-time, and the children were required to attend school, mental health services and medical appointments. The department assessment stated mother did not have a permanent living plan if the children were placed in the family home in the care of S.T., and was concerned she would reside in the home or have poor boundaries regarding her visitation orders with the children. The report stated the department was "concerned" mother was "still involved in an intimate relationship with [father] and that if the children

---

[4] Although the children did not give a date the physical assault occurred, because child 6, the youngest child, was three years old at the time of the report, the incident would have occurred at least three years prior to date the report was drafted.

were placed back in the family home, he would be allowed unauthorized contact with the children." The report stated the department was further "concerned" that the maternal grandfather was now residing in the home, due to the three older children's report that he assaulted mother several years prior.

*November 6, 2023 Disposition Hearing*

On November 6, 2023, the juvenile court held the disposition hearing.

**Mother's Testimony**

On direct examination, mother testified that father moved out of the home on August 12, 2023, 13 days after child 2's disclosure of sexual abuse. When asked if she and father were an "intact couple," she stated they were not, and when asked whether she "planned on having romantic involvement [with father] in the future," she stated she did not. She testified the "only reason I will see [father] is for he still help me with the financial bills like for the rent, for utility and the cell phone," and that her adult son S.T. "will go collect the money from [father] for me," so that she could avoid physically seeing father.

She denied the maternal grandfather physically assaulted her but stated he was going to move out of her home the same day as the hearing and that "[h]e's going to move back with my younger brother or his friend."

On cross-examination by the department's counsel, mother was asked whether it was true that she would leave the home for periods of several hours, as S.T. told children 1, 2, and 3. She replied that she would be gone sometimes for several hours to go shopping for clothes, groceries, or snacks to bring to the children's visits with her, and would coordinate the shopping trips with picking up the money from father.

She also testified, "My dad never beat me while I was pregnant."

Mother stated she believed child 2's disclosure of sexual abuse by father but had been surprised when she learned that father had been doing so for two years in their

15.

home. She testified that she did not, and never had, blamed or antagonized child 2 for making the disclosure. She stated she was surprised the three older children did not want to visit with her because they believed she did not support child 2, stating, "I don't know why they would think that."

She stated she was only asking for family maintenance for children 4, 5, and 6, and not the older three children, because "as of right now … [children 1, 2, and 3] don't want to see me so I want to give them time to let them approach like they want to come themselves. I don't want to force them so when they're ready to come back to me, I always have an open arm ready for them and I do want all my kids back with me."

On cross-examination by the children's counsel, mother stated that she believed child 2 because "I don't think she would lie about it and I just been—so I just recently graduated from pharmacy technician I was kind of overwhelmed and I was sorry I was not there to notice anything." However, she stated there was not anything father did over the last two years that raised concerns.

She testified father would give her money every week or every other week to support the family financially and that she would see him on those occasions to pick up the money and go pay her bills every week. She would arrange the pickup by having S.T. text father.

Mother testified that the maternal grandfather was moving out that day.

On redirect examination, mother testified that she had a phone conversation with maternal grandfather in the hall outside the courtroom before the hearing about him moving out, and that he confirmed he would move out immediately, the same day as the hearing.

On recross-examination by the department's counsel, mother testified she did not know why child 2 told the social worker that she did not want to go home because mother would use the allegation she made against father against her.

16.

**The Social Worker's Testimony**

The social worker, N.D., testified on direct examination that it was her belief that mother and father were still romantically involved, despite mother's testimony that they were not. She stated that when she confronted mother about this, mother explained she saw father to collect money from him but would instead send S.T. to collect the money in the future.

N.D. testified that the department's concern with maternal grandfather residing in the home was that "[children 1, 2, and 3 reported] … that when mom was pregnant, [grandfather] was upset because mom removed—I believe it was they had gotten into an argument in regards to the TV—and so that the grandfather got really upset and ended up pushing the mother or physically harming her while he was trying to leave the home." N.D. stated when she and mother talked about the possibility of placing the children in the home in the care of S.T., grandfather living in the home was a concern.

N.D. stated that she considered the possibility of mother moving out of the home and placing children 4, 5, and 6 in the home in the care of S.T., but that he did not respond to her call or text messages. She testified the three older children told her they did not feel S.T. was "adequately trained to take care of [children 4, 5, and 6] as they are under the age of seven, all three of them, and they felt as if he would not be able to care for them the way … younger children are meant to be cared for," and were concerned he would not be able to transport them to school and meet all their basic needs in addition to taking them to mental health and other appointments. N.D. stated she was also concerned mother did not have a permanent plan for alternative housing if she moved out of the home and "may not respect those boundaries and will eventually go [back] to the home."

N.D. testified that the department was still in the process of assessing mother for progression and towards the end of the month, "if we have no concerns and her services

17.

are progressing well, we'll go ahead and move forward with unsupervised visits." She stated,

> "[Mother] has maintained really good communication with me and we have addressed multiple concerns; however, as of recently, [S.T.] has shared with [children 1, 2, and 3] that [mother] is still seeing [father,] which is a concern because of the allegations [of sexual abuse]. [¶] I believe that anyone who is accused of sexual abuse should be—you should be taking that into account in high regards just because it's important that we continue to maintain the children's safety. [¶] I understand where [mother] is coming from; she wants to, you know, have her children in her care. However, there is a detriment just because of how severe the allegations are and how [child 2] who was sexually abused is sharing her concerns. And I feel as we should be listening to her concerns because she was the one who was sexually abused and she is voicing that. [¶] And as the [d]epartment, we—our job is to maintain the safety of the children and that is what we're doing. So I firmly believe that it is a detriment to return the children to [mother] based on those allegations. [¶] … [¶] [Child 2] does not [want to reunify with mother]; she feels [mother] will not be able to protect her. She feels as if [mother] is just lying and stating that she's not with [father]. Every time I go and visit her, I let her know [mother] wants to visit [her]. [¶] … [¶] And she always tell[s] me no. [Mother] doesn't believe [her] and I know she—she just does not feel comfortable with even visiting [mother] because she feels [mother] will turn her back on her."

N.D. stated that the concern she had after hearing that from child 2 was the same concern she felt for children 4, 5, and 6.

On cross-examination by mother's counsel, N.D. testified that mother reported to her on August 18, 2023, that father had moved out of the home. She testified she believed mother was in denial the first couple of weeks after child 2's disclosure, and that "mother eventually stated that she did believe [child 2]." She confirmed mother wrote letters to the older children.

N.D. testified that S.T. told the older three children "mother was still seeing [father]" but could not answer whether S.T. had any form of personal knowledge. When asked whether it was "speculation," N.D. stated, "They're siblings; they know each other

very well. I don't believe that the older brother would speculate and share this information with the three older [children]."

She testified mother was very engaged with the three younger children for whom she was requesting family maintenance, and had been going to their schools and appointments. She stated there were no reports of abuse to children 4, 5, and 6 since the detention, and that the three children wanted to go home "but they are also not aware of the allegations," although there was no reason why anyone should tell them about the allegations at their ages.

Mother's counsel asked, "How [does child 2]'s belief that mother will side with father create detriment for [children 4, 5, and 6]?" N.D. answered, "Mother was not protective of [child 2] at the start of the case; therefore placing [children 4, 5, and 6] at risk." However, when asked if there was any evidence that mother knew about the sexual abuse or that child 2 told mother about the sexual abuse prior to the day of removal, N.D. stated, "No."

On recross-examination by mother's counsel, N.D. testified count b–1 was found true as to mother but counts d–2 and d–4 against mother were dropped. She stated the detriment to children 4, 5 and 6 that she had mentioned earlier was the seriousness of the allegations in the b count as to both mother and father. However, she stated that count b– 1 as to mother indicated that she did not know the sexual abuse was going on. She stated that although according to the evidence and child 2's statements, there was no way for mother to have known about the sexual abuse, "Once the children were removed, mother did know."

N.D. stated that mother sent a text to child 3 in the first week or so after the disclosure, saying that child 2 "ruined" their family, but that she later apologized for the text. When asked if the text had anything to do with children 4, 5, and 6, N.D. stated, "Yes[,] because the three youngest are part of the family," although children 4, 5, and 6

19.

were not living with the three older children because after the children were removed from the home, they were placed in two different resource family homes and children 4, 5, and 6 had not had sibling visits with children 1, 2, and 3.

On redirect examination by the department's counsel, N.D. testified that children 1, 2, and 3 have a close relationship as a sibling group. She stated that as to the detriment issue, if children 4, 5, and 6 were placed with mother on family maintenance and something happened requiring re-removal, that would be "very detrimental to the children."

**Counsels' Arguments**

The department's counsel argued that "in the aggregate," there was clear and convincing evidence that placement of the children with mother would be detrimental to the children.

He stated there was evidence from children 1, 2, and 3 that mother had not been supportive of child 2 and blamed her for splitting up the family. He stated there was evidence that mother visited father and remained romantically involved with him, giving rise to "detriment in that it causes a great deal of uncertainty around the issue of whether mother can be protective and whether mother understands the allegations that were found true at the jurisdiction hearing. And whether mother will respect the orders of the Court and not expose the children to either harm or the risk of harm at the hands of [father]." He argued there was evidence of risk of detriment because mother's housing plan if she moved out of the home "[was]n't very credible. And, you know, at the trial itself, [mother's] outside calling [the grandfather] to see if he would move out. There's allegations of [the grandfather] physically abusing [mother] while she was pregnant, so that gives rise to issues of domestic violence should the kids go back to her home. She doesn't have a—she cannot articulate a place where she would live if that were to happen." He argued there was a "high level of risk [the children] are placed at given the

20.

allegations which were found true against [father] and mother's apparent inability to comply with Court orders and respect Court orders and keep [children 4, 5, and 6] safe." He contended that "it speaks volumes that the three oldest[, children 1, 2, and 3,] at this point really don't want anything to do with her."

The children's counsel argued he "[did]n't see a plan by [mother] .… There's not a great deal of independence by her. She still has a huge financial reliance on father. [¶] I understand that we could try to distinguish if it's a romantic [relationship] or not but there's still recent concerns about that information that perhaps she still is, but really, again, I think it's very clear that mother has a huge reliance on father currently .… [I]t's not as easy as us just saying, well, let's move father out, … let's move this person out. [¶] [A]t an emotional level, there's a lot going on and there's a lot that needs to be worked on before we try to have the [children] back with mother full time. We're talking about risk … and yes, there is [risk] because we have a case here where there was sexual abuse. We have a case here where we're concerned about mother's ability to be protective. And if there's a huge reliance on father currently and into the future, he's still around in a sense, so there's a danger there. [¶] Let's not wait until something happens before we say, hey, there is a danger. Let's try to be protective and make sure that everything falls into place correctly first for mother so that she is ready for this full-time to be able to take care of her children. [¶] … [¶] [J]ust because maybe there are younger [children] who are three [years old] and five [years old] and maybe unable to really understand anything or verbalize how they feel doesn't automatically lead to the conclusion that everything is great and that they should just return now."

Mother's counsel argued that unless the department, who had the burden, showed clear and convincing evidence of detriment, it was in the best interest of the children, according to statute, to not be removed from mother's care. She contended removal requires strict scrutiny because it is a fundamental right of parents to have their children.

She argued that under *In re M.V.* (2022) 78 Cal.App.5th 944 (*M.V.*), the "aggregate" of the evidence, as argued by the department's counsel, is not clear and convincing evidence because it was only a combination of several different factors that in this case were not even necessarily reliable. She argued that while mother was not ready to admit what father had done at the beginning of the case, the issue is "today, today at the disposition." She argued there was "uncertainty," which was "as close to speculation as you're going to get …. We have uncertainty as to whether mother will respect the orders of the Court in—when [children 4, 5, and 6] get placed with her. [¶] We have uncertainty as to whether she's going to respect the fact that [father] is not supposed to be there." But, she argued, "The fact of the matter is, [mother separated from father] on her own volition. She kicked out [father]. She realized, [']you know what, I believe my daughter['].… ['I] had a hard time coming to the reality of this as I've been with [father] for 22 years, and all of a sudden this is thrown in my face and I'm supposed to believe it in the first hour[']; that's not what happened. She had to basically mourn …. So there is a mourning period for that."

Mother's counsel also argued mother was financially reliant on father, but "[e]ventually family law would call that alimony. The fact he's doing it without a Court order doesn't make it any less of alimony," and that mother recently "got schooling in which she's going to be able to be employed." She argued mother now admits there was substantial danger when father was accused by child 2, not just to child 2, but to all the children. However, she contended, "we have three younger children[, children 4, 5, and 6,] that are very connected with their mother" and were also not living with their older siblings in foster care, and that being removed from both their mother and their older siblings was not in their best interest, according to legislation and common sense. She argued the department must prove there is detriment "now[,] … and the only

22.

circumstance that would have removed [children 4, 5, and 6] is the fact that the father sexually abused [child 2]."

She also argued as to the maternal grandfather that "[m]other made a phone call out in the hallway realizing that the grandfather needed to move and told him to move out today."

**Juvenile Court's Findings**

The juvenile court denied mother's request for family maintenance services for children 4, 5, and 6, and stated it would follow the recommendation of the department to continue family reunification services for her.

The juvenile court recited section 361, subdivision (c), stating that the standard for removal of children from their parents is "clear and convincing evidence that there is or would be substantial danger to the physical health, safety, protection, or physical or emotional well-being of the [children] if the [children] were returned home, and that there are no reasonable means by which the [children]'s physical health can be protected without removing the [children] from the [children]'s parents' physical custody."

The juvenile court then stated it had a responsibility to consider the emotional well-being of the children.

It stated it agreed with mother's counsel that the physical danger to the children was removed as soon as mother separated from father and he moved out of the home. It further stated, "And I will state for the record that I do not believe that there has been enough evidence … that [mother and father] are in a romantic relationship."

The juvenile court then stated it found some of the statements made by mother in her testimony to be "just as disturbing as" some of the statements she made earlier in the case to or about child 2, stating, "When she was asked if she has been antagonistic towards [child 2], she said she hasn't. I know there's been some mention … she apologized for her statements early on [in the letters she wrote to children 2 and 3] but I

23.

see those statements [she made] early on after [child 2's disclosure]—and she may have been in shock, the statements regarding the snacks, the statements regarding is [child 2] happy that she's ruined [their] family—as being horribly harmful to the emotional well-being of all of the children.  And I think that's reflected in [children 1, 2, and 3]'s attitude towards … mother.  [¶]  She did not admit to being an antagonist today on the witness stand, although I believe she has apologized for the specific comments."

Next, the juvenile court addressed the issue of the maternal grandfather, stating it believed the statements of the three older children that the grandfather had physically assaulted mother several years prior when she was pregnant, but "her testimony was that that never happened.  No one ever really asked her, well, what did happen, but she said she's never been assaulted by [the grandfather].  I have no reason not to believe them if all three [older children] said they saw it with their own eyes."

Accordingly, the juvenile court stated, it did not believe mother "gained the awareness of the things that can be emotionally damaging to her children," although "she[ was] on the right path."  The court stated, "I think that she's going to [gain awareness], but a phone call before court that she's having [the grandfather] move out of the house, I don't think that I can order family maintenance right this minute given a promise that he's going to move out and given the lack of reflection that I think [mother] shows with regard to the emotional well-being of these children."

The juvenile court found ICWA did not apply to the children.

The juvenile court stated it found child 2 was "sexually abused by father and there are no reasonable means by which [child 2 could] be protected from further sexual abuse without removing the child from the father."

It next stated it found the children were "at substantial risk of being sexually abused by father and there are not reasonable means by which the children can be protected from the risk of sexual abuse without removing the children from father."

The juvenile court also found the children were "at a substantial risk of being sexually abused while in the care of mother and there are no reasonable means by which the children can be protected from the risk of sexual abuse without removing the children from mother."

It found continued placement necessary and the children's current placements appropriate.

The juvenile court then stated it found, "The [department] has complied with the case plan in making reasonable efforts to return the children to a safe home and to complete the steps necessary to finalize the permanent placement of the children."

Mother's counsel then asked the juvenile court whether she misheard its finding that "there's substantial risk that the children will be sexually abused by the mother?"

The juvenile court responded that "[t]here's no reasonable means by which children can be protected from the risk of sexual abuse without removing the children from [mother]."

Mother's counsel replied, "I don't see how that's physically possible."

The juvenile court then asked the department's counsel, "[I]s the finding that there's clear and convincing evidence that there's substantial danger to the physical health, safety, protection if they are left in the parents' care sufficient or do you need the [section 300, subdivision (d)] finding as well?"

The juvenile court and counsel discussed the matter off the record. The court then stated, "I'm striking the finding that the children are at risk of sexual abuse without removing them from the home of [mother] from the findings and orders."

Mother's counsel then asked,

> "Just for clarity, when this Court found emotional—potential emotional to [children 4, 5, and 6] that don't even know about this, is the Court using the language of [section] 300[, subdivision] (c) that requires suffering serious emotional damage evidenced by severe anxiety,

25.

depression, withdrawal or untoward aggressive behavior towards self or others as a result of the conduct of the parent?"

The juvenile court responded, "I'm just using the language that I have to find that there's clear and convincing evidence that the children—"

The children's counsel interjected, "Right. So the statute [section 361, subdivision (c)] requires substantial danger to the physical health, safety, protection or physical or emotional well-being of the child."

The juvenile court stated, "Correct. And that's what I'm finding."

Mother's counsel continued, "And it requires—"

The juvenile court interrupted her, stating, "Substantial, and is that your issue?"

Mother's counsel responded, "No, my issue is that when it's substantial physical, but the Court has defined under [section] 300[, subdivision] (c) that emotional requires suffering serious emotional damage or is at substantial risk of suffering serious emotional damage evidenced by severe anxiety, depression, withdrawal. In other words, there has to be … so I'm just asking the Court—  [¶] … [¶]  —for clarity so that—"

The juvenile court responded, "That's what I'm finding. And I'm finding that based on comments made to [the three older children] about this situation. I don't think that mother has gained the sensitivity that I don't believe that the other three younger [children]—even though there was a lot of evidence today about them not even knowing about the abuse, if those children are returned to mother before she gains the sensitivity of what is emotionally abusive to her children, they are at risk—when questions are asked, [']where are my siblings[']—of suffering the same emotional abuse that the older three [children] have when mother has to explain her actions .…"

The children's counsel then stated, "And to be clear, we're not finding a [section 300, subdivision (c)] count?"

The department's counsel answered, "That's right."

26.

The children's counsel then stated, "So if that's what [mother's] counsel's asking we're not here for a [section 300, subdivision (c)] count."

The juvenile court answered,

"Right. I'm not here for jurisdiction. I'm not finding a [section 300, subdivision (c)] count. You're just using the language to get clarity. I am finding that there is a risk of emotional abuse if they were returned home and I think part of that is also the living situation. And I failed to state in my earlier findings that part of that is that the [d]epartment has not assessed the older brother [S.T.] yet—that was testimony today—and that the grandfather, as I'm sitting here making my ruling, still lives there and I have no reason not to believe those children that there is domestic violence in that home.

"So I don't think mother understands all of the ways that these relationships and these problems in the home are having an emotional effect on her children, but I think that it's very strong evidence … that the older children want nothing to do with her."

It continued, "I will find that the extent of progress by mother and father toward alleviating or mitigating the causes necessitating placement in foster care has been minimal," and denied reunification services for father.

It then stated,

"I will order as to [the children], they are found to be persons described under [section] 300[, subdivisions] (b) and (d).

"The [children] are made dependents pursuant to [section] 360[, subdivision] (d). All reasonable efforts have been made to prevent removal from the parents. The [children] are committed to the custody and care of the [department].

"Pursuant to [section] 361[, subdivision] (c)(1), the [children] are removed from the custody of both parents."

The juvenile court ordered the children remain in their respective resource family homes and continue the same schedule of supervised visits with both parents, giving the department discretion to increase visits between the children and mother to

27.

"unsupervised, liberal, extended visits," and ordered family reunification services for mother.

The minute order from the hearing stated, "The [children] are found to be persons described under [section] 300[, subdivisions] (b) and (d)" and that "[a]ll reasonable efforts have been made to prevent removal from [mother and father]." The order stated the juvenile court's findings:

> "4) There is clear and convincing evidence that continuance of the children … in the home of [mother and father] is contrary to the children's welfare and:
>
>> "a) There is or would be substantial danger to the physical health, safety, protection, or physical or emotional well-being of the children … if [they] were returned home and there are no reasonable means by which the children's physical health can be protected without removing the children from [mother and father's] physical custody.
>>
>> "b) [Child 2] has been sexually abused by [father] and there are no reasonable means by which the child can be protected from further sexual abuse without removing the child from [father].
>>
>> "c) The children … are at substantial risk of being sexually abused by [father], and there are no reasonable means by which the children can be protected from the risk of sexual abuse without removing the children from the father.
>
> "5) Reasonable efforts have been made to prevent or eliminate the need for removal of the children … from the home and to make it possible for the children to return to their home.
>
> "6) Continued placement of the children … is necessary and the children's current placements are appropriate. [¶] … [¶]
>
> "8) The [department] has complied with the case plan in making reasonable efforts to return the children … to a safe home and to complete any steps necessary to finalize permanent placement of the children.
>
> "9) The extent of progress by [mother] toward alleviating or mitigating the causes necessitating placement in foster case has been minimal.

28.

"10) The extent of progress by [father] toward alleviating or mitigating the causes necessitating placement in foster care has been minimal.

"11) Clear and convincing evidence shows that:

"a) [Child 2] has been adjudicated a dependent as a result of severe sexual abuse to the child by [father] as defined in [section] 361.5[, subdivision] (b)(6), and it would not benefit the child to pursue reunification services with the offending father."

"Finding (4)(d)" on the minute order was stricken, crossed out in with a large handwritten "X." Finding (4)(d) stated, "The children … are at substantial risk of being sexually abused while in the care of [mother] and there are no reasonable means by which the children can be protected from the risk of sexual abuse without removing the children from [mother]."

On November 9, 2023, mother timely filed a notice of appeal.

## **DISCUSSION**

Mother contends the juvenile court erred in denying her request for family maintenance services for children 4, 5, and 6. She argues there is insufficient evidence on the record of clear and convincing evidence pursuant to section 361, subdivision (c) of substantial danger to the physical health, safety, protection, or physical or emotional well-being of children 4, 5, and 6, and no reasonable means by which those children's physical health can be protected without removing them from her care. Mother further argues there is insufficient evidence on the record of whether reasonable efforts were made to prevent or eliminate the need for removal of children 4, 5, and 6 from her care, as required by section 361, subdivision (e), because the department failed to consider alternatives to removal of the children from her care, as required by California Rules of Court, rule 5.690(a)(1)(B)(i).[5] We agree with mother.

---

[5] All rule references are to the California Rules of Court.

### A.    Law

"[O]ur dependency system is premised on the notion that keeping children with their parents while proceedings are pending, whenever safely possible, serves not only to protect parents' rights but also children's and society's best interests." (*In re Henry V.* (2004) 119 Cal.App.4th 522, 530 (*Henry V.*).)  " '[O]ut-of-home placement is not a proper means of hedging against the possibility of failed reunification efforts, or of securing parental cooperation with those efforts[;] [i]t is a last resort, to be considered only when the child would be in danger if allowed to reside with the parent.' " (*In re S.F.* (2023) 91 Cal.App.5th 696, 721.)

Only in a narrow subset of cases where a young child has been severely physically abused and the parent was either the perpetrator of the abuse or unreasonably failed to protect the child from abuse is there a rebuttable presumption that removal is necessary during juvenile dependency proceedings.  (*M.V.*, *supra*, 78 Cal.App.5th at p. 959.)  "In those cases, the fact the court adjudicated the child a dependent under section 300, subdivision (e) serves as prima facie evidence that the child faces a substantial risk of physical harm in the parent's custody and there are no reasonable means to protect the child short of removal.  For all other cases, however, the general rule applies and the juvenile court must find clear and convincing evidence to justify removal.  (§ 361, subd. (c).)" (*In re E.E.* (2020) 49 Cal.App.5th 195, 218.)

Section 300 provides in pertinent part:

"A child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court:  [¶] … [¶]

"(b)(1) The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of any of the following:

"(A) The failure or inability of the child's parent or guardian to adequately supervise or protect the child.

"(B) The willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left.  [¶] … [¶]

"(c) The child is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the parent or guardian or who has no parent or guardian capable of providing appropriate care .…

"(d) The child has been sexually abused, or there is a substantial risk that the child will be sexually abused, as defined in Section 11165.1 of the Penal Code, by the child's parent or guardian or a member of the child's household, or the parent or guardian has failed to adequately protect the child from sexual abuse when the parent or guardian knew or reasonably should have known that the child was in danger of sexual abuse."  (§ 300, subds. (b)–(d).)

Section 361, subdivision (c) requires:

"(c) A dependent child shall not be taken from the physical custody of his or her parents … unless the juvenile court finds clear and convincing evidence of any of the following circumstances listed in paragraphs (1) to (5), inclusive … :

> "(1) There is or would be a substantial danger to the physical health, safety, protection, or physical or *emotional well-being* of the minor if the minor were returned home, *and* there are no reasonable means by which the minor's *physical health* can be protected without removing the minor from the minor's parent's … physical custody. The fact that a minor has been adjudicated a dependent child of the court pursuant to subdivision (e) of Section 300 shall constitute prima facie evidence that the minor cannot be safely left in the physical custody of the parent … with whom the minor resided at the time of injury.  The court *shall consider, as a reasonable means to protect the minor,* each of the following:

>> "(A) The option of removing an offending parent … from the home.

>> "(B) Allowing a nonoffending parent … to retain physical custody as long as that parent … presents a plan acceptable to the court demonstrating that he or she will be able to protect the child from future harm."  (§ 361, subd. (c), italics added.)

31.

Section 361, subdivision (e) further provides:

(e) The court shall make a determination as to *whether reasonable efforts were made to prevent or to eliminate the need for removal* of the minor from his or her home …. *The court shall state the facts* on which the decision to remove the minor is based*.*" (§ 360, subd. (e), italics added.)

Rule 5.690(a)(1)(B)(i) also requires that "[i]f petitioner recommends removal of the child from the home, the [department's] social study must include:

"(i) A discussion of the *reasonable efforts made to prevent or eliminate removal* … and a recommended plan for reuniting the child with the family, including a plan for visitation[.]" (Italics added.)

A parent's lack of transparency or subsequent denial of the events that led to juvenile dependency is not sufficient, by itself, to justify removal of the children from either parent's custody during the proceedings. (*M.V.*, *supra*, 78 Cal.App.5th at p. 962.) However, when considering removal of a child from a parent in juvenile dependency proceedings, " 'the juvenile court must determine whether child will be in substantial danger if permitted to remain in the parent's physical custody, considering not only the parent's past conduct, but also current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention.' " (*M.V.*, at p. 967.)

Where more than one child is the subject of a dependency proceeding, the juvenile court must analyze each child's circumstances independently at the dispositional stage. (*In re Dakota J.* (2015) 242 Cal.App.4th 619, 632.) In addition, while it may often be the case that where removal of one child is necessary, removal of all children in the family also is necessary, that will not always be the case. (See *In re Hailey T.* (2012) 212 Cal.App.4th 139, 147–148 [reversing removal order because fact of infant's injury did not constitute clear and convincing evidence of a substantial risk of harm to older sibling].)

" ' "The elevated burden of proof for removal from the home … reflects the Legislature's recognition of the rights of parents to the care, custody and management of

32.

their children, and further reflects an effort to keep children in their homes where it is safe to do so. [Citations.] By requiring clear and convincing evidence of the risk of substantial harm to the child if returned home and the lack of reasonable means short of removal to protect the child's safety, section 361, subdivision (c) demonstrates the 'bias of the controlling statute is on family preservation, not removal.' " ' " (*M.V.*, *supra*, 78 Cal. App. 5th 944, 959, italics omitted.)

Dispositional findings and orders are reviewed for substantial evidence. (*In re Ashly F.* (2014) 225 Cal.App.4th 803, 809.) But "[s]ubstantial evidence does not mean 'any evidence,' however," and the reviewing court must "ultimately consider whether a reasonable trier of fact would make the challenged ruling in light of the entire record." (*In re Isabella F.* (2014) 226 Cal.App.4th 128, 138.) "Substantial evidence indicates more than a smidgeon or trace; it must be meaningful and significant and cannot be merely speculative." (*In re Ma.V.* (2021) 64 Cal.App.5th 11, 22; *County of Santa Cruz v. City of Watsonville* (1985) 177 Cal.App.3d 831, 845.)

"[A]ppellate review of the sufficiency of the evidence in support of a finding requiring clear and convincing proof must account for the level of confidence this standard demands. In a matter such as the one before us, when reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. Consistent with well-established principles governing review for sufficiency of the evidence, in making this assessment the appellate court must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995–996.)

The burden on appeal to show insufficient evidence lies with the parent. (*In re Isabella F.*, *supra*, 226 Cal.App.4th at p. 138.)

**B.    Discussion**

Section 361, subdivision (c) "is clear and specific." (*In re Jasmine G.* (2000) 82 Cal.App.4th 282, 288 (*Jasmine G.*).) It restrains a juvenile court from removing a child from the physical custody of her parents unless there is clear and convincing evidence of two conditions: (1) "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being" of the child if she is returned home, and (2) "there are no reasonable means by which the [child's] *physical health* can be protected without removing" her from the parent's physical custody. (§ 361, subd. (c)(1), italics added.) Accepting the court's factual findings and all reasonable inferences supporting them (*Henry V.*, *supra*, 119 Cal.App.4th at p. 530), we conclude substantial evidence does not support the court's finding that there was clear and convincing evidence that there were no reasonable means to protect children 4, 5, and 6's *physical health* without removal from mother's care.

We first note it was not alleged mother had physically abused the children and the juvenile court found mother did not and should not have known about father's sexual abuse of child 2. We further note mother's request for family maintenance services was limited to her youngest three children: eight-year-old child 4, five-year-old child 5, and three-year-old child 6. We also note the court expressly found the danger to the children's physical health was removed as soon as mother separated from father, stating, "[mother's counsel] stated that the physical danger was removed as soon as mother removed father from the house and *I agree with that*. And I will state for the record that I do not believe that there has been enough evidence to convince this Court that they are in a romantic relationship." (Italics added.) Further, nothing in this opinion should be construed as condoning father's sexual abuse of child 2 as found by the court. The

34.

court's finding of sexual abuse, however, is not the issue before us. The issue in this appeal is whether substantial evidence supports the court's order removing children 4, 5, and 6 from their home after father was removed from it. A finding of parental abuse is not sufficient by itself to justify removing a child from the home. (See *Henry V.*, *supra*, 119 Cal.App.4th at p. 531; *Jasmine G.*, *supra*, 82 Cal.App.4th at p. 293.)

### *Substantial Danger to the Children's Emotional Well-Being*

The juvenile court found mother posed substantial danger to children 4, 5, and 6's emotional well-being. It based its finding on her general "lack of reflection" and lack of "awareness of the things that can be emotionally damaging to her children," shown during her testimony by her denial that she made comments to the older children about child 2, and denial that the maternal grandfather physically assaulted her. It stated that, accordingly, it did not find "mother ha[d] gained the awareness of the things that can be emotionally damaging to her children," although "she[ was] on the right path." While neither of those incidents directly impacted children 4, 5, and 6, the court explained, "I'm finding that based on comments made to [the older children] about this situation. I don't think that mother has gained the sensitivity that [children 4, 5 and 6]—even though there was a lot of evidence today about [children 4, 5, and 6] not even knowing about the abuse, if those children are returned to mother before she gains the sensitivity of what is emotionally abusive to her children, they are at risk—when questions are asked, [such as, ']where are my siblings[']—of suffering the same emotional abuse that [children 1, 2 and 3] have [suffered] when mother has to explain her actions .… [¶] … [¶] I'm not finding a [section 300, subdivision c] count .…[6] I am finding that there is a risk of emotional

---

[6] The juvenile court stated it was not finding pursuant to section 300, subdivision (c) that "the child is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the

abuse if [children 4, 5, and 6] were returned home and I think part of that is also the living situation. And I failed to state in my earlier findings that part of that is that the [d]epartment has not assessed the older brother [S.T.] yet—that was testimony today— and that the grandfather, as I'm sitting here making my ruling, still lives [in the home] and I have no reason not to believe those children that there is domestic violence in that home. [¶] So I don't think that mother understands all of the ways that these relationships and these problems in the home are having an emotional effect on her children, but I think that it's very strong evidence … that the older children want nothing to do with her."

Accordingly, while those incidents did not directly impact children 4, 5, and 6, the juvenile court was entitled to draw the reasonable inference that those facts showed mother posed a substantial danger to the emotional well-being of children 4, 5, and 6 if they were returned to her care.

### *Reasonable Means to Protect the Children's Physical Health*

Section 361, subdivision (c)(1) requires a second condition be met before the juvenile court may remove a child from her parent's custody. There must also be clear and convincing evidence of "no reasonable means by which the [child's] physical health can be protected without [removal]." (§ 361, subd. (c)(1).) In other words, "California law requires that there be no lesser alternative before a child may be removed from the home of his or her parent." (*Jasmine G.*, *supra*, 82 Cal.App.4th at p. 284.) Further, the second condition of section 361, subdivision (c) is expressly limited to protecting children's *physical health*. (§ 361, subd. (c), italics added.)

---

parent or guardian or who has no parent or guardian capable of providing appropriate care."

Here, after the juvenile court found substantial danger to the children's emotional well-being based on mother's lack of awareness and reflection, it then stated there were "no reasonable means" to protect them without removal.

However, when making this finding, the juvenile court omitted section 361, subdivision (c)'s requirement that there be no reasonable means to protect the children's "*physical health*." (§ 361, subd. (c), italics added.) The record further shows the court clearly based its finding that there were "no reasonable means" to protect the children from the danger it found to the *emotional well-being* of the children, as the court expressly found there was no physical danger to the children once mother separated from father, the offending parent, and removed him from the home. Accordingly, we conclude based on the record that because the children's *physical health* was not endangered, the court could not make the reasonable inference that there were no reasonable means to protect their physical health without removal.

### *Reasonable Efforts to Eliminate the Need for the Children's Removal*

Here, the juvenile court also found, "[a]ll reasonable efforts have been made to prevent removal from the parents." However, the court did not state the facts supporting its conclusion as required by section 361, subdivision (e), and the department's reports and addendums did not specify the "reasonable efforts" employed, as required by rule 5.690(a)(1)(B)(i).

To aid the juvenile court in determining whether "reasonable means" exist for protecting the children, short of removing them from their home, the California Rules of Court require the department to submit a social study which "must include" among other things: "[a] discussion of the reasonable efforts made to prevent or eliminate removal .…" (Rule 5.690(a)(1)(B)(i).) The department has a duty to ensure that reasonable efforts are made to prevent or eliminate removal of children in juvenile dependency proceedings. (*M.V.*, *supra*, 78 Cal.App.5th at p. 964.) Moreover,

37.

dependency laws require that removal be the "last resort." (*Henry V.*, *supra*, 119 Cal.App.4th at p. 525.)

No discussion of reasonable efforts appears in the record in this case. As noted above, the department report merely stated in perfunctory language in the section entitled "Reasonable Efforts" that the court ordered parenting classes, a mental health assessment and recommended treatment, and a domestic violence assessment and recommended treatment services be provided to the parents. No supporting evidence or discussion of other efforts to prevent removal were offered, and the department did not describe the "reasonable means" it had considered and rejected. The only option the department considered aside from foster care was placing the children in the care of S.T. if mother removed herself from the home. However, neither the juvenile court nor the department discussed any options that included mother, the nonoffending parent, remaining in the home. Accordingly, the court could not make the reasonable inference that there were no reasonable means to protect the children's physical health without removal from mother. (See *In re James T.* (1987) 190 Cal.App.3d 58 [removal of 16-year-old son, who had been adjudged a dependent, from his mother's custody was improper absent consideration of less drastic measures].)

The department and the juvenile court committed prejudicial errors in failing to follow the procedures mandated by the Legislature and the Judicial Council for determining whether the children needed to be removed from their home. Ample evidence existed of "reasonable means" to protect children 4, 5, and 6 in their home. Mother separated from father and removed him from the home, had expressed remorse for the statements she made to and about child 2, testified the maternal grandfather was moving out, and was enrolled and participating in a parenting class. Furthermore, "reasonable means" of protecting the children that should have at least been considered included unannounced visits by the department, in-home counseling services, and

checking that the maternal grandfather was removed from the home once children 4, 5, and 6 were returned to mother's care. (See *Henry V.*, *supra*, 119 Cal.App.4th at p. 527.)

On the record in this case, there is a reasonable probability that had the juvenile court inquired into the basis for the department's claim that despite its efforts, there were no reasonable means of protecting children 4, 5, and 6 except to remove them from their home, the court would have found that claim was not supported by clear and convincing evidence. Although troubling, mother's "lack of reflection" or subsequent denial of the events that led to dependency is not sufficient, by itself, to justify removal of children 4, 5, and 6 from her custody. (See *Henry V.*, *supra*, 119 Cal.App.4th at p. 525 ["The law requires that a child remain in parental custody pending the resolution of dependency proceedings, despite the problems that led the court to take jurisdiction over the child, unless the court is clearly convinced that such a disposition would harm the child."]; *Jasmine G.*, *supra*, 82 Cal.App.4th at pp. 289–290.)

Accordingly, the juvenile court's dispositional order as to mother's request for family maintenance for children 4, 5, and 6 must be reversed and remanded for a new hearing in conformity with the statutes and California Rules of Court discussed above.[7] We base our disposition on the facts existing at the time of the dispositional hearing that we determined from the record on appeal. On remand, the court must make its decision based on the facts existing at the time of the further proceedings. (See *In re Ashly F.*, *supra*, 225 Cal.App.4th at pp. 810–11.)

## DISPOSITION

The juvenile court's order is reversed and remanded as to mother and her request for family maintenance services for children 4, 5, and 6. In all other respects, the order is affirmed.

---

[7] We do not disturb the court's findings as to father or children 1, 2, and 3, for whom mother did not request family maintenance.